# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

## IN RE: S.B., ET AL.

### Direct Appeal from the Chancery Court for Humphreys County
### No. 24-149, Robert E. Burch, Chancellor

---

### No. M1999-00140-COA-R3-CV - Decided May 12, 2000

---

The trial court in this case approved the adoption of one sibling by a couple who was unrelated to the child, but who had been caring for her. The appeal was taken by another couple, relatives of the child, who had been caring for and were allowed to adopt, in the same proceedings, the other sibling. Appellants assert that their petition to adopt both children should have been granted because of the preferences for placement within a family and placement with siblings. This court affirms the adoption as ordered by the trial court because the trial court considered all preferences and other relevant factors presented by the facts of this case and made a determination that the best interest of the child favored continuity of placement. The evidence does not preponderate against that finding.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

COTTRELL, J., delivered the opinion of the court, in which CANTRELL, P.J., M.S., and KOCH, J, joined.

Jennifer Davis Roberts, Dickson, Tennessee, for the appellants, Kerry Mangrum and Tammy Mangrum.

Louise R. Fontecchio, Nashville, Tennessee, for the appellees, Barry Baker and Deborah Baker.

### OPINION

This case involves the adoption of siblings by different families. The children were placed in foster care together but were separated when the younger child, R.A.B., a boy, then four months old, was retrieved from foster care by the Mangrums, the Appellants, relatives of the children. The foster mother turned the older child, S.B., a girl, over to another family, the Bakers, the Appellees, non-relatives who later sought to adopt her. After terminating the parents' rights, the trial court allowed each family to adopt the child in its care. The Mangrums appeal the adoption of S.B. by the Bakers and the concomitant denial of their petition to adopt S.B., claiming that the preferences for placement within the family and for keeping siblings together dictate overturning the Bakers' adoption of S.B.

I.

S.B., at five months old, became the subject of a 1996 Department of Children's Services (DCS) investigation because of apparent neglect. S.B. was temporarily removed from the home, but was later returned. DCS continued to work with the natural parents and to make home visits to observe the conditions there. A visit by a caseworker after the younger child, R.A.B., was born resulted in DCS immediately removing both children from the home because S.B. had noticeable bruising on her face. DCS filed a petition for temporary custody, and in February 1997, the juvenile court placed legal and physical custody of both children with DCS.

The children, then ages thirteen months and three months, were placed in a DCS approved foster home in February 1997. Both were hospitalized briefly early in their foster care placement. Meanwhile, relatives of the children's mother contacted DCS and offered to act as "a resource" for care of the children. At that time, Ms. Mangrum, one of the appellants, and her sister, both cousins of the mother, intended to each seek physical custody of one of the children with the expectation that the children would eventually be returned to their parents. Only the Mangrums followed through on their request and sought to have the boy placed in their home. After DCS approved of this family placement, the Mangrums were awarded physical custody of the boy, R.A.B., by court order in March 1997. Because Ms. Mangrum's sister had withdrawn her request to take S.B., the child remained in the foster home, and the siblings were thus separated.

The foster mother felt that she needed help keeping S.B., especially on the weekends, and allowed the Bakers to babysit a few weekends in March 1997 with the knowledge of DCS.[1] DCS records refer to this arrangement as "respite care." By late April or early May 1997, however, S.B. was living with the Bakers most of the time. The extent of DCS's knowledge of this arrangement is disputed, but a caseworker's log indicates that Ms. Baker advised the caseworker on May 7 that S.B. was with the Bakers most of the time. The caseworker had called Ms. Baker to arrange a visit with S.B.'s great-grandmother and to discuss a recent visit. Other records indicate that during that summer the DCS caseworker routinely contacted Ms. Baker to arrange visits with S.B.'s family members. In a progress report dated late June 1997, DCS noted that S.B. was "currently in a home approved by the Department as respite care." The Bakers had not been approved as foster parents when they obtained possession of S.B., but did go through the approval process later.

The Mangrums petitioned for custody of both children in July 1997, and the Bakers filed a petition for custody of S.B. a few days later.[2] In October 1997, the Bakers filed a petition to adopt

---

[1]Ms. Baker was an LPN working in the office of the pediatrician who treated S.B. immediately after her removal from her home. Apparently, the original offer to help came from Ms. Baker during S.B.'s recovery from the hospitalization.

[2]In October 1997, DCS made an effort to remove S.B. from the Bakers' home, but the record does not contain any information regarding the reasons. The record does contain, however, a trial court order, issued after an emergency hearing, in which the court found that the removal of the child

(continued...)

S.B.[3] In November 1997, the Johnsons, relatives of Mr. Mangrum but unrelated to the children, filed a petition to adopt both S.B. and R.A.B. The Johnsons were supported in their petition by the children's mother, who later withdrew her support. In January 1998, the Mangrums filed a petition to adopt both children. All three cases were consolidated and heard in December 1998.

The court held a bifurcated trial: first, to determine whether the parents' rights would be terminated, and second, if the rights were terminated, to determine who would adopt the children. The children's mother, who was divorced from the father by the time of the trial, opposed any adoption, asserting that she wanted the children returned to her. The father appeared at the trial, but voluntarily relinquished his parental rights. The court found that both parents had abandoned the children by failing to visit or support them for four months. Neither parent appealed the termination of parental rights.

In the second phase of the trial, the Mangrums and the Bakers each showed that they had a loving home and that the child placed with that family was thriving and happy there. The Johnsons withdrew their petition to adopt after the other families had put on their proof.

The Bakers asserted their willingness to adopt S.B.'s brother if the court wanted the siblings to stay together. The Mangrums sought to adopt both children, asserting the importance of both their blood relation to the children and of keeping the children together. The court allowed the Bakers to adopt S.B. and allowed the Mangrums to adopt R.A.B., citing in each case the need for continuity of placement. The court then ordered the families to provide for monthly visitation between the children, and "encouraged" visitation between S.B. and the rest of her family.[4]

The court stated:

---

[2](...continued)
was not appropriate given the circumstances and that the best interest of the child dictated that her physical custody remain with the Bakers. The court ordered the immediate return of S.B. to the Bakers.

[3]The Bakers' petition seeks adoption of both children "if the court finds it to be in the best interest of both children to remain together." However, the Bakers' primary position was that each child should remain in the home where he or she had been living and with the couple with whom he or she had formed a parental relationship.

[4]The Mangrums argue that the court ordered visitation between the children cannot be enforced, and the result is that S.B. has been deprived of her relatives by the adoption. The Bakers argue that the court ordered visitation between the children is enforceable and would serve to maintain their relationship. Because neither party has appealed the visitation order, we need not address its validity here.

There are two competing issues here; one is continuity of placement and the other is the keeping of siblings together in a placement with family. The court recognizes and acknowledges the importance of keeping a family unit together insofar as that is possible and the large importance of keeping siblings together. . . . In this case it is my opinion that the continuity of placement takes precedence over the keeping of siblings together and placement with the family. Both of these children, according to the proof, have developed strong bonds with the homes in which they are placed. These children have been in the respective homes for over a year and nearly two. Continuity of placement is not to reward good behavior or to punish bad behavior. The issue is that continuity of placement is good for the child, is best for the child, and to disrupt that would be . . . extremely damaging to the child. . . . The point has been made that through some mistaken or negligent process of the Department of Children's Services the Bakers came to have [S.B.]. I don't think that's contested, but the point is they do have her. . . . In the court's view, to damage [S.B.] in order to correct a bureaucratic error would be the supreme triumph of form over substance.

## II.

Once a parent's rights have been terminated, as here, the court must consider the best interest of the child when granting a petition to adopt. *See Sonet v. Unknown Father of Joseph Daniel Hasty*, 797 S.W.2d 1, 5 (Tenn. Ct. App. 1990). "[T]he best interest of the child is the paramount consideration in an adoption proceeding." *Id.*; *see also* Tenn. Code Ann. § 36-1-101(d) (Supp. 1999) (one of the primary purposes of the statutory adoption process is to protect the best interest of the child involved in the process). The child's interest supersedes any conflicting interest of an adult, and any such conflict must be resolved in favor of the child. *See Sonet*, 797 S.W.2d at 5; Tenn. Code Ann. § 36-1-101(d). The finding of the best interest[5] of the child is a finding of fact, *see Garner v. Garner*, 773 S.W.2d 245, 246 (Tenn. Ct. App. 1989), and unless the evidence preponderates against that finding, we must affirm the trial court's decision, absent an error of law. *See* Tenn. R. App. P. 13(d).

## III.

The best interest of the child in an adoption proceeding has been described as follows:

---

[5]This opinion cites several cases involving child custody incident to divorce as authority when discussing the best interest of the child. The legislature has used the phrases "best interest" and "best interests" in the adoption statutes and "best interest" in the child custody statutes, apparently interchangeably. *See* Tenn. Code Ann. §§ 36-1-101(a)(5), 36-1-101(d) and 36-6-106. Therefore, we are of the opinion that custody cases discussing "best interest" are relevant to a best interest analysis in an adoption setting. Many of the same factors should be considered when deciding between persons competing to adopt a child or between persons competing for the custody of a child.

[It] is an elusive guideline that belies rigid definition. Its purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult. The best interests of the child is [sic] in being raised by the best parent. But that is not a matter that can be ascertained by crude calculation. The factors to be considered in determining what is in the best interests of the child are legion. They vary from case to case and it is impossible to catalog all the factors that may be involved.

2 Am. Jur. 2d *Adoption* § 137 (1994).

The trial court found that S.B.'s interests are best served by continuing and making permanent the placement with the Bakers, with whom she has developed a close relationship and bond, in whose care she has overcome earlier developmental delays, and who have demonstrated the ability to provide a nurturing and stable environment. The Mangrums do not dispute that the Bakers are fit parents or that S.B. has thrived in their care. Rather, they argue that the best interest of S.B. is not served by severing S.B.'s ties with her brother and members of her extended family, an effect they see as a necessary consequence of the Bakers' adoption of S.B. At its simplest, they stated the argument thusly: "The Trial Court should have placed more emphasis on the family ties of the children than it did."

In support of this argument, the Mangrums rely on Tenn. Code Ann. § 37-2-403(a)(1) (Supp. 1999), asserting that it establishes a preference for placement with family over placement through adoption by non-relatives. The text of that statute reads, in pertinent part:

Within thirty (30) days of the date of foster care placement, an agency shall prepare a plan for each child in its foster care. Such plan shall include a goal for each child of:

> (A) Return of the child to the parent;
> (B) Placement of the child with relatives of the child;
> (C) Adoption, giving appropriate consideration to § 36-1-105(e)(1) when applicable;
> (D) Permanent foster care; and
> (E) Emancipation by marriage, court order or reaching the age of majority.

The statutory list of options for placement has been interpreted to mean preference in placement should be made in the order those options are listed. *See State Dept. of Human Serv. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990) ("The first preference is to reunite the family by returning the child to his parents or placing the child with relatives; the second is permanent placement through adoption.") The preference for placement with family, by the language of the above-quoted statute, applies at the time the agency prepares the plan for the child. While placement with relatives may be a future goal, there is nothing in the record before us to indicate that DCS was aware that the Mangrums or any other family members were or would be available for S.B.'s placement at the time

the plan was to be prepared. At the time of the hearing herein, S.B. had been in the Bakers' care for more than a year, so that any preference for a goal of family placement shortly after the removal would have no application.

Further support for family placement is found in Tenn. Code Ann. § 37-2-403(d) which states:

> Whenever a child is removed from such child's home and placed in the department's custody, the department shall seek to place the child with a fit and willing relative if such placement provides for the safety and is in the best interest of the child. Notwithstanding any provision of this section or any other law to the contrary, whenever return of a child to such child's parent is determined not to be in the best interest of the child, then such relative with whom the child has been placed shall be given priority for permanent placement or adoption of the child prior to pursuing adoptive placement of such child with a non-relative.

Again, this provision addresses placement immediately after removal from the home and a preference for adoption by relatives with whom such initial placement has been made. We find nothing in this statute to indicate that an ongoing placement with a non-relative that is otherwise serving the child's best interest must be ended if a family member later seeks to adopt the child. To the contrary, Tenn. Code Ann. § 36-1-101(a)(5) states that a purpose of the statutory adoption process is to ensure that the proceedings are held in a manner "to enable the child to achieve permanency, consistent with the child's best interests, at the earliest possible date."

The Mangrums also rely on the Tennessee courts' stated preference for keeping siblings together. *See Baggett v. Baggett*, 512 S.W.2d 292, 293-94 (Tenn. Ct. App. 1973) ("there is merit in the proposition that children should not be separated by a custody order"). That preference is simply a factor for the court to consider in determining the best interest of the child, however. *See In the Matter of M.W.A., Jr., C.D.A., P.C.A., K.M.A. and A.K.A.*, 980 S.W. 2d 620, 623 (Tenn. Ct. App. 1998) (keeping siblings together was only one of the three factors the court used in determining the children's best interest). It is not a controlling factor. Courts have previously separated siblings if that separation was in the best interest of the child before the court. *See, e.g., Rice v. Rice*, 983 S.W.2d 680, 684 (Tenn. Ct. App. 1998) As this court stated in *Rice*, "Generally speaking, it is not appropriate to separate siblings by a custody order, but this principle is not inflexible. It must give way to other considerations if the best interest of a child so dictates." In addition, in the case before us, the siblings were separated when the Mangrums were granted custody of the boy and S.B. remained in the foster home, when the children were ages fourteen months and four months.

Thus, while the courts and the legislature have recognized that a child's best interest is often served by placement with and adoption by family members and by remaining with siblings, those considerations are only some of the factors which should be weighed by a court in determining a particular child's best interest in a particular situation. Even in situations where the preferences relied upon by the Mangrums are directly applicable, they are not determinative.

IV.

The Mangrums also argue that "family rights" should be given a status similar to parental rights, equating the adoption by non-family members to "termination of family rights."  They correctly assert that termination of parental rights requires clear and convincing evidence that grounds for termination exist, *see* Tenn. Code Ann. § 36-1-113(c)(1) (Supp. 1999), but their argument that due process requires the same heightened standard to be applied before the rights of other family members are severed must fail.  A biological parent's rights are constitutionally based, *see Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626 (1923); *In re Adoption of Female Child (Bond v. McKenzie)*, 896 S.W.2d 546, 547-48 (Tenn. 1995), but there is no such origin for any rights of non-parents.

Similarly, the Mangrums' claim that a showing of harm[6] should have been made before the court proceeded to a best interest analysis for S.B. has no basis in current law.[7]  In effect, the Mangrums ask this court to expand the law in Tennessee to give all family members the same rights to a relationship with children as the parents have, or at least to allow family members to step into the shoes of biological parents upon a termination of the parent's rights.  This we decline to do.[8]  The trial court terminated the parents' rights, and that order was not appealed.  After the termination, the

---

[6]We interpret this argument to mean that the trial court should have determined that allowing S.B. to be placed in a relative's custody or to maintain relationships with family members would result in substantial harm to S.B. as a prerequisite to considering adoption by a non-relative.

[7]The adoption statutes clearly give precedence to the child's interest above any other's and do not require the kind of finding advocated by the Mangrums. *See* Tenn. Code Ann. § 36-1-101(d).

[8]The parent-child relationship enjoys a unique status in the law.  *See Hawk v. Hawk*, 855 S.W.2d 577 (Tenn. 1993).  Our Supreme Court has held that parents have a constitutional right to privacy in their child rearing decisions, absent a showing of significant harm to the child.  *See id*. at 581.  In so holding, the Court found the Grandparents' Visitation Act unconstitutional under Article I, Section 8 of the Tennessee Constitution, "as applied to this married couple, whose fitness as parents is unchallenged." *Id*. at 577.  Thus, the Hawks, a married couple and fit parents, had a right to raise their children without interference or visits from the grandparents, absent a showing of significant harm to the child. The parental right to privacy found in *Hawk* has been extended to families in which the parents are no longer married. *See Simmons v. Simmons*, 900 S.W.2d 682, 684-85 (Tenn. 1995).  A later incarnation of the Act, the statute captioned: "Visitation rights of parents of deceased or divorced parents" has also been found to violate parental privacy rights under the state constitution. *See Ellison v. Ellison*, 994 S.W.2d 623 (Tenn. Ct. App. 1998).  The above-cited cases show that our courts have held parents' rights to privacy in their child rearing decisions to be superior to a grandparent's right to even visit the child, absent a showing of harm.  With these precedents in mind, we cannot agree that the rights of other family members should be given a status similar to the rights of the parents upon the termination of a parent's rights.

court properly proceeded to a determination of the children's best interest and found that the best interest of each child was served by remaining with the family that the child had come to know. The court was not required to find harm to S.B. before permitting the Bakers to adopt her.

V.

The Bakers have cited the statutory preference for adoption by foster parents who have kept the child for twelve months or more, Tenn. Code Ann. § 36-1-115(g)(1) (Supp. 1999), to support their argument that S.B.'s continuity of placement favors them as the adoptive parents.[9] That statute reads:

> When a child is placed in a foster home by the department or otherwise, and becomes available for adoption due to the termination or surrender of all parental or guardianship rights to the child, those foster parents shall be given first preference to adopt the child if the child has resided in the foster home for twelve (12) or more consecutive months immediately preceding the filing of an adoption petition.

S.B. was placed in the Bakers' care "by the department or otherwise." Tenn. Code Ann. § 36-1-115(g)(1). She then became available for adoption "due to the termination or surrender of all parental or guardianship rights to the child." *Id*. The Bakers, though, were not foster parents[10] with whom S.B. had resided "for twelve or more consecutive months immediately preceding the filing of an adoption petition." *Id*. At the time the petition was filed, S.B. had been in the home for approximately six months, not the twelve months required for the statute to control the adoptive placement.

While the statute does not control the placement in this case, it expresses the legislature's recognition of the importance of stability in a child's life. *See* Tenn. Code Ann. § 36-1-115(g)(1). Our courts have expressed similar recognition. *See Taylor v. Taylor*, 849 S.W.2d 319, 328 (Tenn. 1993) (recognizing the child's need for stability when considering whether to allow the custodial parent to move the child to another state). Our Supreme Court stated in *Taylor*, "[T]he collective wisdom of both the courts and child psychologists [reflect] that children . . . need stability and continuity in relationships most of all. This recognition has led to a strong presumption in favor of continuity of placement." *Taylor*, 849 S.W.2d at 328.

---

[9]The Bakers do not argue that the statute controls this case, merely that it indicates a preference for the child's continuity of placement.

[10]When the Bakers first began providing weekend and other respite care for S.B., and when S.B. initially began to spend the majority of her time with them, the Bakers had not been approved by DCS as foster parents. It is not clear whether the statute's preference can be triggered by including time before the custodian is approved as a foster parent. Since we have found the statute inapplicable on other grounds, however, we need not reach this question.

A best interests determination depends upon a true assessment of the emotional bonds between parent and child, upon inquiry into the ethical, emotional, and intellectual guidance a parent gives to the child throughout his [or her] formative years, and often beyond. It must reflect also a factual determination of how best to provide continuity of attention, nurturing, and care. Thus, crucial to a best interests determination is the importance of stability and continuity in the life of the child, and the harm that may result from disruption of established patterns of care and emotional bonds.

2 Am. Jur. 2d *Adoption*, § 137 (1994).

### VI.

The court considered three general preferences established by the legislature and the courts: the preference for family placement, the preference for keeping siblings together, and the preference for continuity of placement. All three preferences relate to the best interest of the child, and none is controlling in the case before us. We find no error in the trial court's considering each preference, as well as other factors, and making a best interest determination for S.B. favoring the continuity of placement.[11]

### VII.

We affirm the order granting the Bakers' petition to adopt S.B. and remand the case to the trial court for any further proceedings as may be required. Costs of this appeal are taxed to the Mangrums, for which execution may issue if necessary.

---

[11]The Mangrums object to the court's reliance on continuity of S.B.'s placement on the basis that the placement was allowed to develop and/or continue through mistakes of DCS and by action of a chancellor sitting by interchange for the juvenile court judge in ordering S.B.'s return to the Bakers home in October of 1997. See fn. 2. The same chancellor recused himself just before the trial in December 1998, having just then realized that he was acquainted with Mr. Baker's brother. The record is devoid of any evidence or implication of impropriety on the part of the chancellor in the October 1997 ruling.