IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 11, 2004 Session

## In re C.D.C., JR.

**Appeal from the Juvenile Court for Greene County**
**No. JV16404     Thomas J. Wright, Judge**

**FILED JUNE 7, 2004**

**No. E2003-01832-COA-R3-PT**

This is a proceeding to terminate the parental relationship between father and son. The mother's relationship had been previously terminated at her request. The trial court terminated the father's parental relationship on statutory grounds of non-support, non visitation, and best interests. Father essentially argues that his son, who was born February 12, 1996 in Texas, was hidden from him, thereby frustrating his efforts to support or visit him. The trial court found that the Respondent had little credibility, that he had no permanent address, and that he failed to keep anyone apprised of his address for the last four years. Judgment affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

WILLIAM H. INMAN, SR. J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., E.S. and CHARLES D. SUSANO, JR., J., joined.

Edward Kershaw, Greeneville, Tennessee, for appellant, Christopher Dean Collins, Sr.

Paul G. Summers, Attorney General and Reporter; Douglas Earl Dimond, Assistant Attorney General, for appellee, Tennessee Department of Children's Services.

### OPINION

The Tennessee Department of Children's Services [hereafter "DCS"] filed this action seeking a termination of parental rights of Christopher Dean Collins, Sr. (Respondent) to his son C.D.C., Jr. The petition alleged (1) that the Respondent willfully failed to visit his son for more than four consecutive months immediately preceding the filing of this petition, and (2) that the Respondent abandoned his son by willfully failing to support him for four consecutive months immediately preceding the filing of this petition, and (3) that the child was found to be dependent and neglected and consequently was placed in the custody of DCS, the Respondent having made no reasonable efforts to provide a suitable home for his son.

<u>The Proof</u>

The child was born in Texas on February 12, 1996. He and his parents were living with Ms. Humphries, maternal grandmother of the child. The relationship was difficult, and the parents left, taking their son with them.

Ms. Humphries filed a petition for custody of the child in Texas. Respondent Collins and his wife each alleged that the other had physically abused the child. There were mutual allegations of drug and alcohol abuse as well as child abuse.

By an order signed on October 7, 1999, the District Court of the 154th Judicial District, Dallas County, Texas, awarded Ms. Humphries custody of her grandson and his younger sister, "C" (d.o.b. 5-16-97)[1]. Neither Mr. Collins nor Ms. Collins attended the custody hearing, although each had been properly served. The Texas court ordered each party to keep the other fully informed of his or her current address, telephone number, place of employment, and work telephone number. In the event either party intended to move, the Texas court ordered that party to inform the other thirty days before moving on the intended date, or, if the information was not available, to do so within five days of the change of address.

The Texas court granted visitation to the parents, and ordered each of them to pay child support of $150.00 per month through the Dallas County Child Support Office beginning September 15, 1999.

In the Tennessee termination hearing, Ms. Humphries testified that she had temporary custody of the child from November 30, 1998, through November of 2001. She testified that Mr. Collins was supposed to visit every two weeks beginning in January 1999, but that he visited some in January and February of 1999, and never visited again. She testified that she never told Mr. Collins that he could not see his son, and that he visited only when "she fed him and stopped coming when she stopped feeding him."

Ms. Humphries testified that Mr. Collins never paid her support for his son and after his final visit in February 1999, "It was like he just dropped off the face of the earth." He never telephoned, and sent no birthday and Christmas cards or gifts. She testified that on October 10, 2000, she and her husband learned that they would be moving from Texas to Tennessee due to her husband's job transfer. She sent a certified letter announcing the planned move to the address that Mr. Collins had given her and the certification card came back to her. She did not include in the letter an address or telephone number because she did not yet know where in Tennessee her family would be living. However, two months later she telephoned Mr. Collins' sister Eunice, at whose address Mr. Collins was believed to reside, and gave Eunice their new address and phone number in Tennessee.

---

[1] "C" remains in Ms. Humphries' custody and her status was not an issue at trial or on appeal.

Eunice told Ms. Humphries that Mr. Collins came to her house every month to pick up a Social Security check, but would not give Ms. Humphries any other address for Mr. Collins. Ms. Humphries tried to locate Mr. Collins through the Social Security Administration, which refused to furnish any information. The Humphries remained at the same address and telephone number through the time of trial.

After moving to Tennessee, Ms. Humphries began to experience difficulty controlling the child. She took him to various neurologists and psychiatrists to no avail. She telephoned Ms. Collins (her daughter) in Texas, who by that time had an income and a home, and informed her that Ms. Humphries' doctor had warned that her own health was at risk due to the difficulties with the child. Ms. Humphries asked Ms. Collins to take custody of her son.

Ms. Collins testified at the termination hearing that she regained custody of her son in November 2001, but was not awarded legal custody until August 12, 2002, when the Texas court returned custody to her, and ordered Mr. Collins to pay support of $200.00 per month. The order recited that Mr. Collins, "although duly and properly cited, did not appear and wholly made default."

On August 8, 2002, Ms. Collins moved with her son from Texas to Tennessee. She attempted to locate and advise Mr. Collins of the move but could not find him. She had called Mr. Collins' sister's house in January 2001 and reported that she planned to move with her son to Tennessee. After moving to Tennessee, she did not know how to contract Mr. Collins.

Ms. Collins testified that Mr. Collins had paid her no support, and sent no special occasion cards. He never telephoned to ask for visitation. Although they were married, Ms. Collins had not talked to Mr. Collins since 1998.

Like her mother before her, Ms. Collins was unable to control her son. His problems grew so severe, in Ms. Collins' words, that "I tried Prozac, Zoloft, Ritalin, anything to get him straightened out and still it wasn't doing anything." Her son came into State custody in October 2002, and she shortly thereafter surrendered her parental rights to her son. The DCS petitioned for temporary custody of the Child in October 2002, alleging that he was essentially without a parent because his mother was unable to care for him and his father was in Texas. An accompanying affidavit of reasonable efforts by a DCS case manager stated that DCS had put crisis intervention services into the home, because the child was "beyond the control of his mother." The order granting temporary custody to DCS on that same day noted that it was not reasonable to prevent removal at that point, "as mother dropped child off at DCS office [plus] said she could not handle him."

DCS case manager Denise Pritchard testified at the termination hearing that Mr. Collins did not receive notice of the petition for temporary custody because no one had his address. She testified, however, that she had spoken to his sister several times, beginning on October 29, 2002. Ms. Pritchard testified that in a telephone call about a month later, Mr. Collins' sister confirmed that Mr. Collins knew that his son was in State custody.

Ms. Pritchard testified that she had tried to locate Mr. Collins through telephone calls and certified mail to his sister's address, which was the only address she had for him. She sent Mr. Collins correspondence, including requests for him to attend Foster Care Review Boards and a letter asking him to call her, let her know where he was living, and to send a picture of himself. She made the latter request because the child had not seen Mr. Collins for so long that "he did not know what Mr. Collins looked like."

Ms. Pritchard explained that if Mr. Collins had ever replied, DCS could have worked through the Interstate Compact on the Placement of Children to get a home study of Mr. Collins' home if he had one, and to get Mr. Collins services such as housing or parenting classes. She testified that Mr. Collins could have worked a permanency plan in Texas.

On January 14, 2003, DCS filed a petition to terminate parental rights. Ms. Pritchard testified that Mr. Collins was served a copy of the petition in January 2003 and Mr. Collins later confirmed that he received a copy of the petition by certified mail.

At no time did Mr. Collins pay any support for his son, and never sought visitation.

Mr. Collins did not contact DCS until he telephoned Ms. Pritchard from a bus stop in Mosheim, Greene County, Tennessee, on Monday, April 7, 2003, two days before trial. He told her that he had no place to stay and no money and was therefore unable to get to Greeneville. (Mosheim is about seven miles from Greeneville.)

According to Ms. Pritchard, the child was placed in a foster home and was doing "extremely well." The foster family wished to adopt him.

Mr. Collins testified that he and Ms. Collins had separated before daughter "C" was born, and that he had lived with Ms. Collins for "about two years," although he had "no idea" what two years those were. He testified that he knew he was supposed to visit his son every two weeks and to pay $150.00 per month child support, but after visiting a few times conflicts developed and he quit visiting.

As to his failure to pay support, he testified, "One time I sent like $100 because I had rent and bills to pay and stuff like that and it came back." He testified that his Social Security benefits that he had been receiving for back spasms had been terminated "[b]ecause I was able to work, that's my guess." Mr. Collins testified that he worked at an IGA store in 2000 and then at a Wal-Mart until September 2002. He had not been employed since losing the Wal-Mart job, but he testified that he was able to provide for himself out of savings and by doing odd jobs. He was living in a trailer in exchange for helping his landlord, and never attempted to locate his son, except that he knew he was in State custody in Tennessee since October 2002. He admitted that he had done nothing to contact DCS although he had the proper address.

His testimony demonstrated some lapses. He testified that he had no criminal convictions and had never been arrested. When asked about a November 10, 1997 arrest for assault upon "his common-law wife," he answered, "I forgot about that little incident." He could not remember his address in Rome, Texas, where he said he had lived for two years ending about six months before trial. He could not remember when he learned that Ms. Humphries had temporary custody of his son or who told him. He testified that he had lived with a woman, Lisa Hines, whom he referred to as his "common law wife" for about four years. She had left him, but when asked when she had left, Mr. Collins answered, "I'm not good with dates. I have no idea." He also had "no idea" when he lost his Social Security benefits, although it had been "a long time ago."

## The Issues

As propounded by the appellant, the issues are:

1. Whether the evidence supports a finding that Appellant abandoned his child by willfully failing to visit him for four (4) consecutive months immediately preceding the filing of the Termination Petition.

2. Whether Appellant abandoned his child by willfully failing to support or make reasonable payments toward the support of his child for four (4) consecutive months preceding the filing of the Termination Petition.

3. Whether it is in the best interests of the Child and the Public that Father's parental rights to his child to be terminated.

As propounded by DCS the issues are:

1. Whether the trial court properly terminated Mr. Collins' parental rights for abandoning Junior when Mr. Collins did nothing to maintain contact with or pay support for Junior for several years before DCS filed the petition to terminate Mr. Collins' parental rights.

2. Whether clear and convincing evidence supports the trial court's determination that termination of Mr. Collins' parental rights was in Junior's best interest.

## The Findings

The trial judge found:

[T]he Court found that grounds had been established. In my looking back at the transcript in connection with reviewing your briefs, . . . the Court did not make a determination on best interest nor did the parties argue beyond the guardian ad litem at that time on the best interest of the child. I suppose just to make it clear, the Court finds by clear and convincing evidence that the grounds set forth in the Petition to Terminate Parental Rights have been established and I find that based upon all of the testimony presented that Mr. Collins did willfully fail to visit or engage in more than token visitation for most of the child's life . . . after the first year or two when he and the mother of the child resided together, and that Mr. Collins willfully failed to support the child.

Until fairly recently the proof was that he had never really been without income, although it was disability income for a period of time, and that the only effort he ever made to support the child was one check that he sent that came back to him. He was not certain whether it just came back because of a change of address or otherwise, and that he then took that money, purchased some things for the child and delivered them to his mother-in-law's home where the child had been staying.

It's clear that he had a statutory duty to support his child, but he was also aware of a specific legal duty of child support in the State of Texas that he never tried to comply with other than the one check. Despite his potential intellectual limitations, he was sophisticated enough to know about custody proceedings and to indicate that it was his intention at one point to try to file for custody of his children and that he knew his mother-in-law had custody of the children: that he also knew a couple years ago that the children had come to Tennessee and that he knew sometime in probably October or November after their removal that the children were in the State's custody here.

It's further clear that he received his copy of the Petition to Terminate through certified mail which went to the same Dallas, Texas address that all the other mail had been sent to, which is his sister's address, and that he received that certified mail at that address and yet still made no efforts to contact the caseworker of the Department or anyone else involved in this so that he could attempt to develop a plan to obtain custody of his child, or to pay his support or to set up visitation until he actually arrived in Tennessee to everyone's surprise in April via bus to contest the termination petition. That was approximately three and a half or four months after he was served with the petition.

The record reflects that Mr. Collins basically just allowed his child to not be a part of his life and that he took no real actions to try

to maintain or seek out or enforce what should have been his legal right and relationship with the child.

So those are the factual findings that the Court makes to support the legal conclusions that I've already reached.

Now, what about the best interest of this child? Two facts obviously that I already know about; number one, the child is in a prospective adoptive foster home which the indication is that those foster parents would adopt the child. They've already been providing a home for the child and the child is doing well in that home at the present time. The other fact that we know is that there is a sibling to this child that's not in the State's custody, but continues to remain in the care of the grandmother. Isn't that right? Remains in the care of the grandmother who is Mr. Collins' mother-in-law still because he never was divorced from the mother of this child, or either child. So we've got those two facts and I don't know how, how to spin the second fact or how it plays into the best interests determination at this point. The first fact obviously supports termination and indicates it would be in the child's best interest. The child has bounced around with the grandmother and the mother for its six or seven years of existence; finally is in a stable environment with some potential for permanency.

Mr. Collins, on the other hand, has bounced around much like the child or perhaps worse. There are periods of unemployment and he claims no homelessness, but certainly no ability to provide a home for himself during many of these periods after his disability check stopped. Certainly, he doesn't have a mailing address as he continues to receive mail at his sister's house, basically maintains all contact with the world it seems through his sister; is living in a dilapidated trailer which he's supposed to be fixing up in exchange for rent at the present time. He has no driver's license, no job, no money. When he appeared for the trial [he] had contacted the Department of Children's Services upon his arrival at the bus station in Greene County with no money and no prospect of getting from the bus station to the courthouse, nor with any provision for a place to stay while he was here.

\* \* \* \* \*

With regard to the best interests of the child in the termination decision. I'm going to specifically go through the factors set forth in subsection (i) of the Statute.

Number one, whether the parent has made such an adjustment of circumstance, conduct or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian. The answer to that is no. Mr. Collins, you know, doesn't appear to have

made much of any change in his circumstances since the time he split up with his ex-wife, the mother of this child.

Number two is about making an adjustment after reasonable efforts by available social services agencies. That one does not really apply in this case because Mr Collins never contacted anyone in Tennessee until he showed up for the trial and therefore, was never able to take advantage of any social services agency efforts.

Number three, whether the parent has maintained regular visitation or other contact with the child. The answer to that is no, which is in favor of termination.

Four, whether a meaningful relationship has otherwise been established between the parent and the child. The answer to that also is no. I think that at best, the dad testified that he had seen the child three or four times for a brief period of time since he and the mother split up. Obviously, the child doesn't even know what he looks like, so that also favors the termination.

Number five, the effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical conditions. So far as we know, there's no medical condition that might be affected by a change. The child does have emotional problems, although the extent and specific nature of those has not been identified by anybody in this record. There's no doubt that in general, as the Statute favors, stability is in the emotional and psychological best interests of a child and a change in caretakers at this point would probably [have] a detrimental impact on this particular child, particularly in light of his apparent emotional problems, so that would favor a termination.

Number six, whether the parent or someone residing with the parent has shown brutality, physical, sexual, emotional or psychological abuse, etcetera, does not apply in this particular instance and would, in fact, I suppose favor the father retaining his rights.

Number seven, whether the physical environment of the parent is healthy and safe, whether there's criminal activity in the home, use of alcohol or controlled substances. Based upon the description of the physical environment of Mr. Collins' home I would say that it's not a healthy and safe place for the child to be placed. On the other hand, we don't have any indication in this record that there's any criminal activity in the home and the only evidence we have about the alcohol and substance abuse is that Mr. Collins does not engage in that and therefore, the first aspect of item number seven here favors termination and the second aspect of it favors Mr. Collins retaining his rights I suppose.

Number eight, whether the parent's mental or emotional status would be detrimental to the child or prevent the parent from effectively providing a safe and stable care and supervision for the child. At this point there's no indication that Mr. Collins' mental and emotional status would be detrimental or prevent him from caring for the child. We don't know much about his status, but he obviously was able to be determined to be competent to handle his own funds at some point during his period of disability and then to actually be able to get to work, so I think that would favor Mr. Collins.

Number nine, whether the parent has paid child support consistent with the Child Support Guidelines. Obviously, he hasn't paid anything, really never tried. He had not only a moral and general legal obligation to support the child, but a specific legal obligation in the Courts of Texas that he was aware of and failed to really take any steps to try to comply with other than sending the one check that came back.

On the whole, those nine factors having been considered I think tend to favor a termination in the case. The only thing that caused me any real pauses was the fact that he made a pretty significant effort on his part to show up up here and try to stave off the termination, which seemed so odd because he's done so little, really nothing, the rest of the child's life. My concern in these cases is for the child. . . . you know, Mr. Collins has his own life. Whether this child becomes a part of it or not isn't going to make much difference in Mr. Collins' life I'd say. My only hesitancy is whether I'm doing the child a disservice by not keeping his biological father as a part of his life in that he, as all children are, is interested in who his real dad is evidenced by his desire to have to have a photo of him.

I mean it's just going to be – his mother has abandoned him also obviously, by surrendering her rights. The grandmother that probably raised him for most of his life has given up on him and I hate the potential emotional impact that those two facts will have, coupled with his biological father also wouldn't be a part of his life if I terminate. However, he never has been a part of his life after the first two years of birth and hopefully, he can understand at some point that his dad did make some effort to try to prevent his rights from being terminated to the extent that that might give him emotional comfort. But I do think it is in the child's best interest based upon all of those factors that the termination, that the parental rights of Christopher Dean Collins, Sr. to the child . . . be terminated and therefore, I grant the petition to terminate the rights of Mr. Collins.

<u>Analysis</u>

Parents have a fundamental right to the care, custody and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). Because this right is not absolute, parental rights may be terminated if the State proves by clear and convincing evidence that such termination is justified under the applicable statute. *Santosky v. Kramer*, 455 U.S. 745, 768 (1982); *Drinnon v. Brown*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). Moreover, all issues are premised on the foundation of "what is in the best interest of the child." *Tennessee Dep't. Of Human Services v. Riley*, 689 S.W.2d 164, 169 (Tenn. Ct. App. 1984).

The "clear and convincing" heightened evidentiary standard "serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). "Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "It should produce in the fact-finder's mind a firm belief or conviction with regard to the truth of the allegations sought to be established." *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995).

On appeal, the trial court's findings of fact are reviewed *de novo* upon the record with a presumption of correctness, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *In re Adoption of Self*, 836 S.W.2d 581, 582 (Tenn. Ct. App. 1992). In turn, issues of law are reviewed *de novo* upon the record with no presumption of correctness. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Further, as to the credibility of trial witnesses, the reviewing court should give considerable deference to the trial court's findings. *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. Worker's Comp. App. Panel1995); *Sonet v. Unknown Father of Hasty*, 797 S.W.2d 1, 5 (Tenn. Ct. App. 1990).

The Tennessee Supreme Court requires that "before a parent's rights can be terminated, there must be a showing that the parent is unfit or that substantial harm to the child will result if the parental rights are not terminated." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999). "The trial court is required to find only one statutory ground for termination of parental rights," *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003), which is sufficient to establish substantial harm, or a parent's unfitness and, therefore, to "support a termination of parental right." *In re Valentine*, 79 S.W.3d at 546 (citation omitted). Thus, the State need not prove all of the grounds alleged. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000).

The petition to terminate the father's parental rights was filed in January 2003, when his son was six years of age. Parental rights may be terminated if the parent has abandoned the child within the meaning of Tenn. Code Ann. § 36-1-102(1)(A), which provides that "abandonment" meaning . . . .(i) for a period of 4 consecutive months immediately preceding the filing of petition . . . the

parent . . . willfully failed to visit or willfully failed to support . . . the child.[2]  The DCS argues that the father's rights were terminated under two (2) separate abandonment grounds: (1) that he willfully failed to visit his son for more than four months before the petition was filed, and (2) that he willfully failed to pay any support after being ordered to do so be the Texas Court in 1999.  In separate orders the Texas Court required the Respondent to notify his wife or his mother-in-law of any change of address.  He neither visited, nor paid support, no advised his wife or mother-in-law of his address.

The thrust of the Respondent's argument that he could not have willfully abandoned his son because "he was hidden" from him [as in *Swanson, supra*] is pejorative.  The Respondent was firmly obligated by two judicial orders to keep his wife and mother-in-law informed of his address; he admitted that his sister told him two years before the trial of this matter that his son had been moved to Tennessee, and he admitted that six months before the trial he knew his son was in State custody, but that he made no effort whatever to contact DCS.  Finally, the DCS representative recited her rejected efforts to involve the Respondent in the life of his son, all of which he ignored.

In order to terminate parental rights, it must be determined by clear and convincing evidence that grounds exist, but also that termination is in the child's best interest.  The statutory scheme provides:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2)Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

---

[2] In *Tennessee Baptist Children's Home v. Swanson*, 2 S.W.3d 180 (Tenn. 1999) the statutory definition of abandonment was declared unconstitutional.  The defective definition was cured by legislative amendment, but pending curative enactments, the prior statute controlled, which, for definitional purposes, contained as elements of intent both a failure to visit and failure to support.  Tenn. Code Ann. § 36-1-102(1)(A)(i) (1994 Supp.).

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household.

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann § 36-1-113(i).

We recognize that a parent who fails to support a child because he is financially unable to do so is not willfully failing to support the child. *O'Daniel v. Messler*, 905 S.W.2d 182 (Tenn. Ct. App. 1995). But the Respondent makes no claim that he was unable to support his son. He simply failed to do so, for years. His seeming indifference carried over to his wife, whom he never supported, but instead he contracted a "common law marriage" with another woman, for four years. The somewhat disjointed testimony fully supports the finding of the trial judge that the Resondent "basically just allowed the child to not be a part of his life" and that he took no action to maintain a relationship with his son. The record further reflects that the Respondent's daughter – still in the custody of her grandmother – is similarly of little concern to the Respondent. So is his wife to whom he remains "unfortunately" married; so is his "common-law" wife of four years, whose whereabouts at the time of trial he disdained. He had no mailing address at the time of trial; he maintained contact "with the world" through his sister; he resided in a dilapidated trailer; he has no drivers license, no job, no funds. He appears to be a vagabond by choice, since he finds employment when he chooses to do so.

In sum, the record reflects that a statutory grant for the termination of parental rights was proved by clear and convincing evidence, Tenn. Code Ann. § 36-1-113(c), and that the termination was in the child's best interests, Tenn. Code Ann. § 36-1-113(c)(2). The judgment is affirmed. Costs are assessed to the appellant.

_____
WILLIAM H. INMAN, SENIOR JUDGE