Harry Israel SONET and wife, Mary Elisabeth Prim Sonet, Appellants,

v.

UNKNOWN FATHER OF JOSEPH DANIEL HASTY (SONET), Respondent, and State of Tennessee, Department of Human Services, Intervenor–Appellee.

Court of Appeals of Tennessee, Middle Section.

June 22, 1990.

Permission to Appeal Denied by Supreme Court Sept. 24, 1990.

Mary Anne Kevil, Nashville, for appellants.

Charles W. Burson, Atty. Gen. & Reporter, Dianne Stamey, Asst. Atty. Gen., Jane Crisp, Dept. of Human Services, Nashville, for appellee.

## OPINION

CANTRELL, Judge.

The appellant, Mary Elisabeth Sonet, appeals the trial court's dismissal of her petition to adopt Joseph Daniel Hasty, and the trial judge's finding that the adoption was not in the child's best interest.

Joseph Daniel Hasty was born on November 20, 1987 to an unmarried teen-aged daughter of a workman who did odd jobs for Mr. and Mrs. Sonet. The natural mother surrendered the child to Mr. and Mrs. Sonet on November 25, 1987. The Sonets filed a petition to adopt on April 7, 1988. After a hearing in the lower court in August of 1989, the trial judge denied the petition. For the reasons set out below, we affirm the judgment.

### Facts

Harry and Mary Elisabeth Sonet married in June of 1987. Although there is some confusion in the record about her date of birth, Mrs. Sonet was approximately sixty-five years old at the time of the marriage. Mr. Sonet was sixty-two. They met in Florida where Mrs. Sonet has some property. After moving to Nashville, Mr. Sonet went into the music publishing business, which subsequently failed.

Mr. Sonet had been married three times before this marriage. Mrs. Sonet had been

married twice before; one marriage ended in divorce, the other by the death of her husband. She had one child and adopted another. Her son, the adopted child, died at the age of twenty-one; her daughter lives in Houston, Texas.

In November of 1987, the fourteen-year-old daughter of a man working for Mr. and Mrs. Sonet gave birth to a son, Joseph Daniel Hasty. The Sonets, who had previously discussed adopting a child, persuaded the mother to surrender the child to them. They filed a petition for adoption in April of 1988. In January of 1989, Mr. Sonet was hospitalized for complications from a diabetic condition. His business had failed and financial problems connected with that failure caused a strain on the party's relationship. For a time Mrs. Sonet and the child lived in a home without electricity. When Mr. Sonet left the hospital in February of 1989, Mrs. Sonet and the child had moved out of the home they had previously occupied and the Sonets have not lived together since that time. Mr. Sonet ceased to be a factor in this adoption. The petition has been pursued solely by Mrs. Sonet.

The record contains evidence on both sides of the adoption issue. Mrs. Sonet has spent a good part of the last two years defending her right to the custody of the child. Some of the charges against her border on the trivial; others are more substantial. The cumulative effect on the child is probably tragic. While the record would support different conclusions about Mrs. Sonet's parenting abilities, none of the charges reflect a lack of concern or care for the child.

Wanda Martin, a Protective Service worker assigned to the Sonet case, testified that the Department of Human Services had received five neglect referrals regarding this child. The first referral was received on June 27, 1988, and alleged that this child was not being properly cared for and was being carried awkwardly. As the referent had only the car tag number, the Department did not locate Mrs. Sonet until after the second referral was received from Metro General Hospital on July 7, 1988 asserting that Joseph was a failure to thrive child. The failure to thrive was asserted to be caused by neglect due to a lack of knowledge in properly caring for an infant.

On September 30, 1988, the Department received two referrals alleging that Joseph was being neglected due to no electricity in the home among other concerns. An investigation revealed that although the home was without electricity, Mrs. Sonet was making the necessary provisions for Joseph's food and care.

Another referral of neglect was made on January 4, 1989, alleging that Joseph was malnourished and developmentally delayed. An investigation by the Department of Human Services did not substantiate this allegation.

On March 31, 1989, Joseph was removed from the custody of Mrs. Sonet by the State of Florida Department of Health and Human Resources. Mrs. Sonet was in Florida taking care of some of her business interests. She stopped at a roadside park where the child allegedly ran into the road and climbed on the playground equipment unsupervised. When Mrs. Sonet asked a stranger in the park to watch the child for her, some bystanders became concerned and contacted the Florida Department of Human Services. Because of Mrs. Sonet's age, her out of state automobile registration, and the lack of any papers showing her right to custody of the child, the authorities were suspicious that the child was being kidnapped.

From March 31, 1989 until May 11, 1989, Joseph remained in the custody of the Florida Department of Health and Human Services and resided at the Lee County Children's Home. During that period of time Joseph contracted strep throat, scarlet fever, pink eye and ear infections. Joseph was placed in the temporary legal custody of the Tennessee Department of Human Services on May 11, 1989 and subsequently placed in a foster home in Tennessee for about one month until custody was returned to Mrs. Sonet by court order on June 26, 1989. Mrs. Sonet testified that when he was returned to her, Joseph had two fingernails missing and that one of his

toes was raw and bleeding from wearing shoes that were too small and that he had another ear infection.

On June 23, 1989, the Tennessee Department of Human Services had Joseph evaluated at the Vanderbilt Child Development Center by Dr. Anna Baumgaertel. She found that Joseph had been environmentally deprived over a long period of time and that he was developmentally delayed as a result. At eighteen months, she found Joseph to have developed only to the extent of a thirteen month old. She advised against his being returned to the custody of Mrs. Sonet.

On the other hand, Dr. Charlene Weisburg, the pediatrician at Metro Nashville General Hospital that treated Joseph for failure to thrive, feels strongly that Mrs. Sonet should be allowed to adopt the child and does not attribute Joseph's slow development to environmental deprivation, but to the fact that Joseph's parents are short and small.

Mrs. Sonet was evaluated by numerous doctors and social workers prior to the hearing. These evaluations resulted in both negative and positive recommendations. Dr. James Siebold, clinical psychologist, examined Mrs. Sonet to evaluate her psychological capacity to parent an infant child. Although Dr. Siebold found that Mrs. Sonet was "alert, well-groomed, ... good-natured, optimistic, and cooperative," he had "serious concerns about her capacity for insight, flexibility in responding to demands, and ability to solicit help and support as necessary." He also stated that she had "hypersensitivity and hyperreactivity to emotional stimulation" and concluded that she was "well-suited to serve in a grandparent capacity" but not as Joseph's primary caretaker.

Dr. William G. Kremper also performed a psychological evaluation of Mrs. Sonet, but had a different view of her capacity to parent. He found that

Ms. Sonet is a colorful, well-educated, active and energetic woman who is friendly and outgoing. She is somewhat naive and trusting and does not always think things through before acting. She is strongly attached to her son and has made personal sacrifices to adopt him. She is keenly aware of her son's physical, health, social, educational and emotional needs and has provided for them. Interview and psychological test data do not indicate she is likely to abuse or neglect her child.

Ms. Sonet is considered capable of adequately parenting her son at this time and in the near future.

Dr. Robert Bobbitt, clinical psychologist at Vanderbilt University School of Medicine, performed a neuro-psychological evaluation on Mrs. Sonet. In his report, he stated that

There is no question that Ms. Sonet loves and cares for her adopted son. Likewise she has the capacity to do so....

High stress over disintegration of her recent marriage may have affected her judgment in the past 18 months....

Perhaps if Ms. Sonet was allowed to reduce her stress level, possibly during an extended probationary period, and sought some brief psychotherapy during this time aimed at handling stress and/or avoiding it, some of the doubt would be removed regarding her parenting skills.

Janet Weismark, social worker for Luton Mental Health Center, testified that she performed a parenting assessment of Mrs. Sonet. Ms. Weismark testified that she could not recommend that the adoption be allowed as she found Mrs. Sonet to be an inappropriate parent and she did not believe that Mrs. Sonet was capable of learning to be a good parent. In her evaluation, she stated:

It appears that Ms. Sonet would not be an appropriate parent for Joseph at this time as she does not demonstrate the ability to see herself as she is. She denies any and all problems and tries to present herself in an overly positive light. Her overidentification with Joseph would hamper normal, healthy development and most likely lead to an enmeshed mother/son relationship. Her knowledge of child development and age-appropriate expectations was poor. In

general, her ability to effectively parent was poor.

Wanda Martin and Cindy Holton are the two social counselors from the Tennessee Department of Human Services assigned to the Sonet case. Wanda Martin testified that none of the five neglect referrals received prior to the Florida incident justified removal of Joseph from the Sonets' custody. Moreover, she testified that the Sonets were willing to work with the Department on any problem it found.

Cindy Holton testified that the Department had requested evaluations of Mrs. Sonet prior to the Florida incident. She also testified that in the Lee County Children's Home in Florida, Joseph had contracted strep throat which turned into scarlet fever.

Shirley Bailey, the Guardian Ad Litem appointed for Joseph in Florida, reported on May 12, 1989, that she believed it was in Joseph's best interest to return him to the custody and care of Mrs. Sonet. Her report stated in pertinent part as follows:

Joseph ... has been ripped from the only love he has ever known, and has been placed in an institutional environment, beyond his ability to comprehend. In my opinion, the child is being traumatized, and has now contracted scarlet fever....

It is my recommendation that the child, Joseph Sonet, be given into the care and custody of his guardian [Beth Sonet] as soon as his disease permits, and that if there is further concern about her fitness, it should be dealt with in the State of Tennessee, where the adoption is in progress.

I feel there has been a terrible unfairness to Joseph in this whole episode, and that people who were acting for his good, have had input from persons who perhaps are worried about Joseph's position in the family affecting their own future. Joseph doesn't care about money. If he could tell you what he wants, this little boy would tell you he wants his mom. As long as no one finds any real concrete reason why Mrs. Sonet should not have her son with her, I recommend the Court take what steps are appropriate to bring this about.

In addition to the positive and negative evaluations of Mrs. Sonet by professionals, there is both positive and negative testimony in the record from those who knew the Sonets personally. Their pastor, William J. Miller of Brentwood United Methodist Church, stated in a letter to D.H.S.:

There is no doubt that in the short term, Harry and Mary will provide the best care possible for this child. However, I question whether they will have the stamina to care for him in the long term. This is especially related to Harry's health and work schedule as well as Mary's emotional stability under stress.

At trial, Janet Hicks testified in favor of Mrs. Sonet's adoption of Joseph. She and her husband and son have lived with Mrs. Sonet since November of 1988. She stated that she has observed that Mrs. Sonet "takes very good care of [Joseph]." Susan Kennedy, who at one time was a neighbor of Beth Sonet, also testified that the petitioner was a good mother to Joseph.

At the conclusion of the proof, the trial court dismissed the adoption petition and awarded custody of Joseph to the Tennessee Department of Human Services in order that Joseph be placed in a stable and permanent environment. The trial court found that due to the lack of Mrs. Sonet's parenting ability with no foreseeable improvement, her age and the child's failure to thrive, it is not in the best interest of Joseph to continue to live with or to be adopted by Mrs. Sonet.

## The Standard of Review

The appellant's brief states that "if Mrs. Sonet were Joseph's biological mother, as opposed to his real and bonded mother," then the legal standard required to remove Joseph from Mrs. Sonet would be a clear and convincing showing of abuse, neglect or abandonment by Mrs. Sonet. The appellant argues that neither this standard nor the conditions for the removal of a child set forth in Tenn.Code Ann. § 37–1–147(d) have been met by the evidence in this case.

The above requirements, however, are for a termination of parental rights rather than an adoption petition case and do not apply here.

■ It is well established that the best interest of the child is the paramount consideration in an adoption proceeding. *In re Adoption of Hart,* 709 S.W.2d 582 (Tenn. App.1984); *In re Adoption of Taylor,* 678 S.W.2d 69, 71–72 (Tenn.App.1984). Moreover, when the interest of a child and those of an adult are in conflict, such conflict must be resolved in favor of the child. Tenn.Code Ann. § 36–1–101(c) (1984).

■ There was conflicting evidence presented at trial as to whether it was in the best interest of this child to be adopted by Mrs. Sonet. Mrs. Sonet testified that she loved Joseph and that she had been a good mother to him. There was no dispute that Joseph was bonded to Mrs. Sonet. However, for every positive evaluation of Mrs. Sonet as a parent, there is a negative evaluation to match it.

■ Mrs. Sonet's age was one factor mentioned by the trial court in its decision to dismiss the adoption petition. Age is a legitimate factor to be considered in adoptions especially if the petitioner could not be expected to be in good health until the child is emancipated. *In re Adoption of Hart,* 709 S.W.2d 582 (Tenn.App.1984). Mrs. Sonet is now approximately seventy years old. Her only help in raising the child would come from the unrelated family living in her home. The child is now al-

most three. We agree that Mrs. Sonet's age is a factor to be considered. The other factors mentioned by the trial court were a lack of parenting ability with no foreseeable improvement and Joseph's failure to thrive in Mrs. Sonet's care.

■ Our standard of review is "de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the vidence is otherwise." Tenn.R.App.P. 13(d). Also, the findings of the trial court as to the credibility of the witnesses are entitled to great weight. *Royal Insurance Company v. Alliance Insurance Company,* 690 S.W.2d 541 (Tenn.App.1985); *Duncan v. Duncan,* 686 S.W.2d 568 (Tenn.App. 1984). After a careful review of the record in this case, we conclude that the judgment of the trial court is supported by a preponderance of the evidence.

The judgment of the lower court is affirmed and the cause is remanded to the Davidson County Circuit Court for any further proceedings necessary. Tax the costs on appeal to the appellant.

LEWIS and KOCH, JJ., concur.