### In re S.S.

### E.D., Appellant.

### No. 00–FS–609.

District of Columbia Court of Appeals.

Argued Jan. 15, 2003.
Decided April 17, 2003.

---

John J. Connelly for appellant.

Sheila Kaplan, Assistant Corporation Counsel, with whom Arabella W. Teal, Interim Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for the District of Columbia.

Before SCHWELB, RUIZ, and WASHINGTON, Associate Judges.

SCHWELB, Associate Judge:

E.D., the mother of S.S., a girl born on December 5, 1996, appeals from an adjudication that S.S. is a neglected child within the meaning of D.C.Code §§ 16–2301(9) and (23) (2001).[1] The trial judge held, in essence, that the mother, a non-custodial parent who had regular visits with her daughter every second weekend, failed to take reasonable steps to protect S.S. from alleged sexual abuse by two of her older brothers. On appeal, the mother claims that, as a non-custodial parent, she is not subject to the child neglect statute. She also asserts that the trial judge "abused [her] discretion [by] deciding the case against the weight of [the] evidence." We affirm the adjudication that S.S. was neglected by her mother within the meaning of § 16–2301(23).

## I.

### THE EVIDENCE

On January 4, 2000, a child neglect proceeding was instituted by the District of Columbia against the mother on the basis of the allegations described above. An evidentiary hearing was held on March 22, 2000. The testimony at the hearing revealed that when S.S. was two months old, the mother effectively evicted the child and S.S.'s father from the family home and placed S.S., her bathtub and her clothes out on the street.[2] In accordance with the order of a Maryland court, S.S. was placed with her father in the home of her paternal great-aunt, a retired social worker.[3] S.S. has lived with the great-aunt ever since.[4] Although the relationship between the mother and the great-aunt has been less than cordial, the mother had unsupervised visitation with S.S. Indeed, until the events that gave rise to this proceeding, the mother took S.S. to her (the mother's) home every other weekend.

In the summer of 1999, when S.S. was just over two and one half years old, the great aunt noticed disturbing signs that S.S. may have been sexually abused. Specifically, according to the great-aunt, the little girl engaged in what appeared to be sexual play with her doll. The child also placed a toy dog in the area of her vagina, and she stuck a crayon up her rectum. S.S. told her great-aunt that her older brother, D.S., then aged nine or ten, had done the same thing to her.[5] S.S. also

1. D.C.Code § 16–2301(9) defines a "neglected child" *inter alia* as a child

 (A) who has been abandoned or abused by his or her parent, guardian, or other custodian; or
 (B) who is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his or her physical, mental, or emotional health, and the deprivation is not due to the lack of financial means of his or her parent, guardian, or other custodian;

 D.C.Code § 16–2301(23) defines an "abused" child as

 a child whose parent, guardian, or custodian inflicts or *fails to make reasonable efforts to prevent the infliction of physical or mental injury upon the child, including excessive corporal punishment, an act of sexual abuse, molestation, or exploitation,* or an injury that results from exposure to drug related activity in the child's home environment. (Emphasis added.)

2. This testimony was provided by S.S.'s godmother and was uncontradicted.

3. The Maryland order is not in the record on appeal, but the parties are in apparent agreement that S.S.'s placement was pursuant to that order.

4. At the time of the evidentiary hearing, the father, allegedly a drug abuser, was incarcerated at Lorton.

5. Counsel for the mother objected to this testimony on hearsay grounds. The Assistant Corporation Counsel responded that the evidence was not "necessarily" being offered to

reported that D.S. had "tickled my pee pee."

The great-aunt explained that the expression "pee pee" was not used in her house, and that S.S. must have picked it up somewhere else. During the summer, S.S. also began to use the expletive "fuck." In August 1999, alarmed by these developments, the great-aunt decided to tell the mother what was going on. The two women had a conversation which both described as hostile and unsatisfactory. It appears that the mother disbelieved the great-aunt and said that the story was a lie. The great-aunt asked S.S. to tell her mother what she (S.S.) had told the great-aunt, but the child appeared afraid and said nothing.[6]

Notwithstanding the unproductive discussion between the great-aunt and the mother, the mother's unsupervised visitation continued for several additional months. According to the great-aunt, there was a brief period after that conversation during which S.S.'s behavior improved and became less sexually oriented. As the year progressed, however, there was a gradual increase in S.S.'s talk about sexual topics, and the child began to use new toys to touch her vagina. The great-aunt testified that S.S. would "run up and

bite you," "rub[ ] herself against your leg," engage in "some up and down movements that just seem[ed] to be sexually natured"; the great-aunt found S.S.'s behavior "very disconcerting." S.S. also told the great-aunt that another brother, K.S., was "playing with her pee pee." K.S. was about twelve years old; S.S. was not yet three.

Because of what she viewed as the mother's lack of interest following the initial disclosures in August, the great-aunt did not tell the mother of the subsequent developments. In December 1999, however, the great-aunt did report the suspected abuse to the police and, specifically, to Child Protective Services. The great-aunt also took S.S. to Children's Hospital.[7]

Suzanne Levin, M.D., a board-certified pediatrician at Children's Hospital, was qualified without objection as an expert on pediatrics and child abuse. Dr. Levin testified that she examined S.S. on December 27, 1999, after the great-aunt brought her to the hospital for suspected sexual abuse. According to Dr. Levin, S.S. told her that K.S. "touched her pee pee"; the judge overruled the mother's hearsay objection, relying on an "[e]xception to the hearsay rule."[8] Dr. Levin testified that S.S. had a "normal" anal and vaginal examination, but

---

prove the truth of the child's assertion, but rather to show that an allegation of abuse was made. The judge overruled the objection, but ruled that the child's remarks did not fall under the hearsay exception for statements made to obtain medical treatment.

6. The mother testified that she questioned D.S. regarding whether he had touched S.S. inappropriately, that D.S. denied it, and that she believed him.

7. According to the great-aunt, S.S. told "everybody" about K.S.' actions, including the doctor at Children's Hospital, a child psychologist, and visitors to the home. This testimony was admitted over a continuing hearsay objection by counsel for the mother.

8. The judge's ruling was correct. *See Galindo v. United States*, 630 A.2d 202, 210 (D.C.1993) ("Even if statements of fault are generally excluded from the medical diagnosis exception, a statement by a child or her parent that the child has been sexually assaulted by someone who is effectively a member of the child's immediate household is admissible when reasonably pertinent to treatment, because the injury involves more than mere physical injury, but has psychological and emotional consequences as well."). (Internal citations and quotation marks omitted.) *Cf. Sullivan v. United States*, 404 A.2d 153, 159 n. 11 (D.C. 1979) (statements to physician finding fault usually "lack any assurance or reliability and would properly be excluded") (citation omitted).

stated that this was true in 80 to 85 percent of cases of suspected abuse. Dr. Levin acknowledged that she did not know whether the claimed abuse actually happened; she explained that she did no investigation and that investigation was not part of her job.

At the close of the District's case, the mother's counsel made an oral motion for "summary judgment, direct[ed] verdict," which the court denied. The mother's thirteen-year-old daughter then testified that she never saw either of her brothers harm S.S. when S.S. visited the mother's home.[9] The witness admitted, however, that S.S. did not "open up and talk to her ... all the time."

The mother testified on her own behalf. Discussing her unsupervised visits with S.S., she stated that she bathed the little girl, changed her clothes, played with her, and took her out with the other children. According to the mother, S.S. was "always laughing and playing"; she was also "fun." The mother believed that the great-aunt's allegations about abuse by D.S. were untrue, and she confirmed that the great-aunt had never relayed to her S.S.'s later allegations against K.S. The mother stated that she had never seen S.S. act out sexually.

The mother testified that she did not consider it appropriate to discuss the allegations of sexual abuse, which she did not credit in any event, with a child as young as S.S. Nevertheless, the mother claimed

that, following her conversation with the great-aunt, she did ask S.S. if her brother had touched her; she asserted that S.S. did not respond. The mother also testified that she took S.S. to a doctor, whose name the mother could not recall; the mother also remembered very little about this medical appointment.

## II.

### THE TRIAL COURT'S DECISION

On March 27, 2000, the trial judge issued findings of fact and conclusions of law in which she held that S.S. had been sexually abused and that her mother had failed to protect S.S. from the abuse. The judge credited the testimony of the District's witnesses, and she found that the great-aunt had observed S.S. placing toys in her anus and vagina, using the word "fuck," and engaging in inappropriate sexual play. The judge found that in December 1999, S.S. had told the great-aunt that one or more of S.S.'s brothers had "played with her pee pee," that the great-aunt had told the mother, and that the mother had called the allegations "lies."[10] On the other hand, the judge did not believe the mother's testimony that she (the mother) had talked to S.S. about whether S.S.'s brother had touched her "pee pee."[11] The judge also discredited the mother's claim that following the great-aunt's disclosures, the mother had taken S.S. to the hospital for an examination.[12] The judge found that

9. According to the witness, "the aunt and the cousin tried to say K.S. touched her but he didn't."

10. This finding was partially incorrect, at least as to the date. It is undisputed that the conversation between the mother and the great-aunt took place in *August* 1999, at which time the only brother alleged to have abused S.S. was D.S. It is likewise undisputed that the great-aunt never told the mother about the later alleged abuse by K.S.

11. The judge found that this testimony was incredible because the mother "was unable to relate what she said to [S.S.] about such an important subject."

12. The judge noted that the mother "was unable to provide the court with any specific information to bolster her testimony, such as the name of the doctor or any further documentation."

the mother "did not take appropriate actions to safeguard the respondent," that she "continued to expose [S.S.] to her brothers," and that she "allowed her feelings toward [the great-aunt] to get in the way of her responsibilities toward caring for the respondent." The judge found S.S. to be a neglected child within the meaning both of § 16–2301(9) and of § 16–2301(23). At a disposition hearing on May 11, 2000, the judge ordered that S.S. continue to reside with the great-aunt under the protective supervision of the court and that the mother be permitted supervised visitation. This appeal followed.

## III.

### LEGAL DISCUSSION

A. *The mother's status as a non-custodial parent.*

 The mother first contends that child neglect proceedings could not lawfully be instituted against her because she did not have custody of S.S. She concedes that this contention is presented for the first time on appeal, and that our review is therefore for plain error. *See, e.g., District of Columbia v. WICAL Ltd. P'ship,* 630 A.2d 174, 182 (D.C.1993).[13] In order to show plain error, the mother must demonstrate that the trial court's decision was "plainly" or "obviously" wrong and that the error was so serious that failure to

correct it will result in a miscarriage of justice. *See, e.g., United States v. Frady,* 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *In re A.R.,* 679 A.2d 470, 478 (D.C.1996); *WICAL,* 630 A.2d at 182–83.

 In this case, there was no plain error. In the District of Columbia, a child is "neglected" if her *"parent,* guardian, or custodian" fails to take reasonable measures to protect her from sexual abuse. *See* D.C.Code § 16–2301(23) (quoted in note 1, *supra* ) (emphasis added). Obviously, the mother is S.S.'s parent, and cannot and does not claim the contrary. The legislature could have limited coverage to custodial parents, but did not do so. Where, as here, the language of a statute is clear and unambiguous, the court must apply its plain meaning. *See, e.g., James Parreco & Son v. District of Columbia Rental Hous. Comm'n,* 567 A.2d 43, 45–46 (D.C.1989).

Moreover, although the mother did not have legal custody of S.S., she had *actual* custody of her for two days every two weeks. Indeed, the alleged abuse of S.S. occurred while the child was staying at the mother's home. There is nothing in the language or purpose of our child neglect statute to suggest that, under these circumstances, the mother had no responsibility to protect her daughter from harm. At the very least, it is not "obvious" that

13. The mother never moved to dismiss the proceeding on the ground that, as a non-custodial parent, she was not subject to an adjudication of neglect. When the great-aunt's attorney interrogated the mother regarding her having taken S.S. to the doctor, however, the mother's counsel did object that "[s]he doesn't have custody here. The custody is with the grandmother [sic]. She only has visitation rights." In our view, this objection did not apprise the trial judge with "sufficient precision to indicate distinctly the party's thesis," later argued on appeal, *see Hunter v. United States,* 606 A.2d 139, 144

(D.C.) [ (citations omitted) ], *cert. denied,* 506 U.S. 991, 113 S.Ct. 509, 121 L.Ed.2d 444 (1992), that a neglect proceeding may not be instituted against a non-custodial parent. Indeed, the mother's attorney has not argued that the claim was preserved in the trial court by the objection described above. *But cf. Yee v. Escondido,* 503 U.S. 519, 534, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992) (where *claim* is preserved in trial court, party is not limited on appeal to precise *arguments* presented below); *West v. United States,* 710 A.2d 866, 868 n. 3 (D.C.1998) (quoting *Yee* ).

the mother had no such responsibility, nor does a determination that the mother had that responsibility while the child was in her care result in a miscarriage of justice. *A.R.*, 679 A.2d at 478.

■ We do not suggest, of course, that a non-custodial parent who lives away from her daughter and has no contact with her would be responsible under the neglect statute for any harm that might befall the child. Indeed, in such a situation, the District could not prove that the non-custodial parent "failed to make reasonable efforts" to protect the child within the meaning of the definition of "abused child" in D.C.Code § 16–2301(23). We hold only that a non-custodial parent may be the subject of an adjudication of neglect if, as a result of the parent's own conduct, the child is subjected to neglect. In other words, the status of non-custodial parent does not automatically provide a defense to a neglect proceeding, but there can be no finding of neglect unless the parent has been shown, by a preponderance of the evidence, to have personally failed in the discharge of her parental responsibilities vis-a-vis the child.

B. *Sufficiency of the evidence.*

■ Although the mother's attorney has framed the second issue presented on appeal as whether the judge abused her discretion in weighing the evidence, the mother's position can be more accurately characterized as a challenge to the sufficiency of the evidence to show that the mother neglected S.S. In assessing evidentiary sufficiency,

> we must consider the evidence in the light most favorable to the [District], giving full play to the right of the judge, as the trier of fact, to determine credibility, weigh the evidence, and draw reasonable inferences .... The [District] is entitled to the benefit of all reasonable

inferences from the evidence, nor may any distinction be drawn between direct and circumstantial evidence.

*In re S.G.*, 581 A.2d 771, 774 (D.C.1990) (citation omitted). The mother's burden in challenging the judge's finding that the mother's efforts to protect S.S. were insufficient is therefore a formidable one.

■ Although the District's case against the mother, even under the *S.G.* standard, is less than overwhelming, we think it sufficient, although perhaps barely so, to pass muster. It is undisputed that the mother was warned in August 1999 that S.S. had allegedly been abused during her visits to the mother's home. There was testimony from the great-aunt, credited by the court, that during the period between August and December 1999, while visitation at the mother's home was continuing, S.S.'s age-inappropriate sex-related behavior increased. Indeed, this conduct on S.S.'s part was consistent with and supported the judge's finding that S.S. had in fact been abused. Moreover, the judge, who had the opportunity to observe the mother testify, expressly disbelieved the mother's assertion that she had questioned S.S. about the allegations of abuse, as well as the mother's claim that she had taken S.S. to the hospital for an examination. The judge could reasonably believe that, if the mother had taken adequate steps to assure that S.S. would not be abused, this would have reduced the likelihood that the subsequent developments in the child's behavior would have occurred. We cannot say that a finding based on this analysis is "plainly wrong or without evidence to support it." D.C.Code § 17–305(a) (2001).

The case is somewhat troubling because the mother testified that she questioned D.S. about the allegations—predictably, according to the mother, D.S. denied them—and the court made no finding as to whether this questioning occurred. More-

over, the judge appears to have believed that the mother was aware of the allegations against both D.S. and K.S., even though the great-aunt and the mother each testified that the mother was never told about K.S.'s alleged abuse of S.S. These discrepancies are not, however, critical to the trial judge's decision, and we conclude that the dispositive finding, namely, that the mother did not adequately protect S.S. from sexual abuse within the meaning of D.C.Code § 16–2301(23), was not clearly erroneous. Accordingly, the decision that S.S. was neglected by the mother because the mother "fail[ed] to make reasonable efforts to prevent the infliction . . . of sexual abuse" is hereby

*Affirmed.*[14]

14. The judge also found the evidence sufficient to establish that S.S. "is without proper parental care and control necessary for her physical, mental and emotional health," within the meaning of D.C.Code § 16–2301(9). In light of the judge's praise of the great-aunt's care for S.S. and the mother's non-custodial status, we conclude that the evidence is insufficient to show a violation by the mother of this particular provision.