894 A.2d 436 (2006)
In re Petition of A.C.G., E.D., Appellant.
No. 03-FS-1540.
District of Columbia Court of Appeals.
Argued October 18, 2005.
Decided March 16, 2006.
*437 Stephen L. Watsky, Washington, appointed by the court, for appellant E.D.
Marion E. Baurley, Washington, appointed by the court, for appellee A.C.G.
Stacy L. Anderson, Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General for the District of Columbia, and Edward E. Schwab, Deputy Attorney General, were on the brief, for appellee District of Columbia.
Lucy Vera Osakwe, appointed by the court, filed a statement in lieu of brief for appellee S.S.
Leonard J. Kelly, appointed by the court, filed a statement in lieu of brief as the guardian ad litem.
Before SCHWELB and FARRELL, Associate Judges, and NEBEKER, Senior Judge.
Opinion for the court by Senior Judge NEBEKER.
NEBEKER, Senior Judge:
Appellant, the biological mother of S.A.S., challenges the termination of her parental rights and adoption of S.A.S. by her paternal great-aunt, A.C.G. She asserts that the trial court erred in concluding that there was sufficient evidence in the record to support the termination order. In addition, appellant contends that the adoption was not in the best interests of the child because the court did not adequately consider the advanced age of A.C.G. at the time of the adoption. We affirm.

I.
S.A.S., a female, was born in December 1996. She lived with her biological parents in an apartment in Prince George's County, Maryland, until she was approximately two months old when the relationship between her biological parents ended. Appellant effectively evicted the child and her father from the family home and placed the child and her belongings out on the street in inclement weather. As a result, the father and child went to live in the home of the father's aunt, A.C.G. A Maryland court order gave custody of the child to the father who in turn gave temporary guardianship to A.C.G.[1] Thus, S.A.S has lived with and been cared for by her *438 great-aunt, A.C.G., for virtually all of her life.
A.C.G. assumed the primary responsibility for S.A.S.' care and upbringing and it is undisputed that A.C.G. has provided a loving home for this child with little financial support from either parent. For approximately two and one-half years, S.A.S. participated in weekend visits every other weekend at the home of appellant and her half-siblings. In August 1999, A.C.G. observed dramatic changes in the child's behavior after she returned from a weekend visit with her mother. S.A.S. began putting toys in her vagina and reported to A.C.G. that her eleven-year old half-brother, Ke.D. was putting crayons in her rectum and other objects in her vagina. A.C.G. attempted to convey her concerns to appellant but the results of this conversation were unproductive, although between August and November 1999, S.A.S' behavior improved and she did not report any further incidents of inappropriate contact during the weekend visits with appellant and her half-siblings.
In November 1999, however, S.A.S. began exhibiting other disturbing behaviors such as pulling up her dress, cursing, touching her vagina, and touching other people inappropriately. A.C.G. took S.A.S. to Child Protective Services and then for a physical examination at Children's National Medical Center soon after S.A.S. told guests during Christmas dinner that Ke.D. was playing with her "pee pee" all the time. The government filed a neglect petition in January 2000 alleging that appellant failed to protect S.A.S. from being sexually abused by her half-brother.
S.A.S. was referred to a psychologist and was treated for approximately one and one-half years for posttraumatic stress disorder from the trauma caused by the sexual abuse. Appellant did not cooperate with the psychologist's treatment plan for S.A.S. and she refused to have her son, Ke.D., undergo a psychological evaluation to determine if he needed treatment. The Honorable Kaye K. Christian found on March 27, 2000, that S.A.S. was neglected because appellant failed to protect her from her half-brother's sexual abuse and she was without proper parental care and control. Judge Christian's order also awarded appellant weekly supervised visitation.[2]
The weekly supervised visitation with S.A.S. and appellant and her half-sister continued, with appellant cancelling only two or three visits because of work. Social workers noted that appellant interacted appropriately with S.A.S. and that S.A.S. seemed to enjoy these visits. But the social worker also indicated that appellant did not have her son, Ke.D., evaluated during this period and that without such an evaluation, reunification of the family would be difficult since it was important to ensure S.A.S.' safety and well-being in appellant's home.
A.C.G. filed a petition to adopt S.A.S. on June 7, 2000. She told the trial court that she wished to pursue adoption instead of guardianship because an adoption would offer more permanency and stability for the child. The Honorable Arthur L. Burnett, Sr. conducted a nine-day adoption trial where he heard testimony from twelve witnesses and received numerous reports and exhibits as evidence. Ultimately, *439 the trial judge issued a forty-page opinion and findings of fact that granted A.C.G.'s adoption petition and terminated the parental rights of both appellant and the biological father.

II.
Appellant argues that there is not sufficient evidence in the record to support the termination of her parental rights. We recognize that the termination of parental rights has long-lasting repercussions for both the biological parent and the child, but based on our standard of review, we find that there is no reversible error in the trial court's decision to terminate appellant's parental rights and grant A.C.G's petition to adopt S.A.S.
We review the trial court's legal determinations de novo and its findings of fact under a clearly erroneous standard. In re J.D.W., 711 A.2d 826, 830 (D.C.1998). In evaluating the best interests of the child, D.C.Code § 16-2353(b) provides four factors to consider in determining whether a biological parent's rights should be terminated. They are:
(1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;
(2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;
(3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or caretakers, including the foster parent;
. . .
(4) to the extent feasible, the child's opinion of his or her own best interests in the matter ....
D.C.Code § 16-2353(b)(1)-(4) (2001). "Proofs made in a termination proceeding must satisfy the clear and convincing evidence standard ... that lies somewhere between a preponderance of evidence and evidence probative beyond a reasonable doubt." In re K.A., 484 A.2d 992, 995 (D.C.1984) (internal citations omitted).
In evaluating the child's need for continuity of care, the trial court found that S.A.S. had lived with A.C.G. since she was approximately two months old. As a result, A.C.G. was the only real mother that the child had known and was totally committed to fulfilling the child's needs on a daily basis. Not only was A.C.G. responsible for molding S.A.S.' value system but she also ensured that the child received appropriate schooling and was involved in many extracurricular and cultural activities. The trial judge did express some concern that A.C.G. was seventy-seven years old at the time of the adoption trial and it would be unlikely that she would live until the child reached the age of majority. However, the trial court's concerns about the inability of A.C.G. to provide continuity of care for the child were mitigated because A.C.G. had established two back-up caretakers, aged sixty-seven and forty-one, who were family members and well known to the child, and who had agreed to rear the child in the event of A.C.G.'s death or disability.
Ms. Rosalie Smith was identified as the primary backup caretaker in the event that A.C.G. was unable to care for S.A.S. Ms. Smith testified that she has been to A.C.G.'s house every day since S.A.S. arrived.[3] During the first six months after *440 the child arrived at A.C.G.'s home, Ms. Smith "played with her and read stories to her." Ms. Smith also participated in the child's doctor's appointments and helped obtain a Medicaid card for the child so she could receive medical coverage. Ms. Smith emphatically testified, "I have been involved in [S.A.S'] life [ever] since the day I brought her into my cousin's house." When asked to describe her relationship with S.A.S., Ms. Smith testified, "I love her like she was one of my own." Ms. Smith has reared five children and one of her grandchildren. Clearly, Ms. Smith is not a stranger to S.A.S. She has played an active caretaking role in S.A.S' young life that is certainly more profound than E.D.'s weekly one-hour supervised visitation sessions. Conversely, since approximately age three, the extent of E.D.'s involvement in her young daughter's life has consisted of a one-hour weekly session of what amounts to supervised play time. Unlike E.D., A.C.G. and Ms. Smith have more than adequately demonstrated their devotion and ability to care for this child day in and day out. E.D., through her own actions and inactions, has not acted in the best interests of this little girl.
The trial court also considered the physical, mental and emotional health of all of the parties involved in this case. While the trial court determined that appellant may not have a diagnosable mental illness, the record showed that she demonstrated various deficits in her emotional character that impaired her parenting abilities. These personality weaknesses were particularly evident when appellant failed to cooperate with the social workers and psychologist involved in her daughter's treatment for sexual abuse at the hands of her half-brother.
Kim Gentin, Ph.D., the clinical psychologist who treated S.A.S for sexual abuse, testified that "I don't believe that [E.D.] is playing a positive role in S.'s life." Dr. Gentin testified that S.A.S. told her during therapy sessions that "her mother [E.D.] wants to kill me and wants to kill everybody." She offered the following testimony regarding E.D.'s responses to the sexual abuse of S.A.S.:
I find her volatile and she wasn't able to really consider S.'s condition or even understand S. And I felt like in the parent-child sessions it was about her and not about S., and in her getting S. back. But it wasn't really about what's in the best interest of S., and that is what I found in my interactions with Ms. D.
Dr. Gentin further testified that "[S.A.S.] was at a very high risk for regressing, becoming angry, depressed, sexually acting out again" if she were returned to her mother's custody. Dr. Gentin also added that she believed "S. will adjust very well to being adopted." To be sure, when posed a hypothetical question about the impact of the death or disability of a child's caretaker on the child, Dr. Gentin responded that "Might have a devastating effect, it depends on the child."
Moreover, E.D. denied that she was ever "ordered to do certain things by the court," but testified that she instead attended parenting classes, had a psychological evaluation, and took Ke.D. for therapy[4] based on her own volition. This testimony conflicts with that of social worker Thomas *441 Mrosko who testified that after he gave E.D. a referral to Children's Hospital and recommended to her that she have Ke.D. evaluated, "She opposed it. She said she did not feel it was necessary to do it now after the time has passed since it [sic] initially came in for the abusing." E.D.'s testimony about these matters appears from the record to be quite evasive. While E.D. may not know exactly how these episodes of sexual abuse transpired, her less than candid[5] and noncompliant behavior is ample justification for the trial judge to believe that she was not truly motivated to resume unsupervised visitation with S.A.S. and ultimately permanent reunification with her child. This rejection by E.D. of the recommendations of the social worker and psychologist and E.D.'s unwillingness to work with other adults with regards to S.A.S.' well-being[6] led the trial court to believe that E.D. was unable to act in the best interests of S.A.S.
Appellant's own expert witness testified that she lacked stability in her relationships with men. Dr. Stammeyer testified that E.D.'s unstable relationship with men would impair her ability to effectively rear a young child.[7] E.D. has had five out-of-wedlock children with at least three different men. Although the trial court did note that E.D. has maintained custody of two of her children who are apparently successfully negotiating their early adolescence, E.D. was not able to maintain custody of two of her other children. One of those children was reared by his maternal grandmother and another by his father. In addition, Dr. Stammeyer was "fairly concerned about [E.D.'s] ability to decompensate, basically, under stress." Past history would support E.D.'s inability to maintain permanent custody of more than two children for an extended period of time.
The court also noted that appellant's instability and lack of good judgment was further evidenced by her use of marijuana and cocaine and a criminal conviction for distribution of cocaine prior to the birth of S.A.S.[8] The court found that the combination of all of these factors would provide an unstable living environment for S.A.S. and that a return to appellant's custody would cause regression in the emotional development of this seven-year old child.
The trial court further considered the quality of interaction and interrelationships between the child and appellant, her half-siblings, paternal great-aunt and other extended family members involved in the caretaking relationship. Despite the fact that S.A.S. enjoyed her weekly visits with *442 appellant and her half-sister,[9] the trial judge found that it was clear from the record that S.A.S. had a more intense and secure attachment to A.C.G. than appellant since she had lived with A.C.G. from the age of two months.
Although S.A.S. did not testify in this case, the trial court was able to infer from the child's actions and conduct that her best interests would be satisfied by terminating appellant's parental rights and granting A.C.G.'s adoption petition. The trial court relied heavily on appellant's lack of appropriate behavior to ensure S.A.S.' safety and well-being after suffering sexual abuse at the hand of her half-brother. After the trial court's March 2000 neglect finding, appellant had an opportunity to comply with the case plan created by the Child and Family Services Agency. Appellant chose not to follow the recommendations outlined in this plan, thus jeopardizing a return to unsupervised visitation with her daughter let alone a return to some type of permanent custody.
Moreover, A.C.G. testified that she tried to have a relationship with E.D. since S.A.S.' birth, and further that up until the time of the neglect proceedings in January 2000, E.D. was welcome to telephone her or S.A.S. at any time, but that she did not call except on one occasion. A.C.G. further testified that E.D. was not welcome in her home because "she was often rude to me and my cousin."[10] Thus, the record supports the trial court's finding that E.D.'s "general belligerency and hostility in interacting with other adults in position of authority"[11] precludes her from putting the best interests of her child first.
We hold that there was sufficient evidence to support the trial court's conclusions regarding § 16-2353(b)(1)-(4). Appellant initially abandoned her child at the age of two months. She failed to comply with the terms of a Maryland court order that required her to pay $150 per month in child support,[12] and instead relied on A.C.G. to provide total emotional and financial support for S.A.S. on a daily basis for almost seven years. After S.A.S. was adjudged neglected by appellant in March 2000, appellant failed to comply with substantive terms of the case plan except for actively participating in weekly supervised visitation with the child. Accordingly, we find no error in the trial court's decision to terminate appellant's parental rights.

III.
Appellant argues that she did not withhold her consent to the adoption contrary *443 to the best interests of S.A.S. in light of the advanced age of A.C.G. It is left to the sound discretion of the trial court to determine what is in the best interests of the child in any adoption case. In re J.D.W., supra, 711 A.2d at 830. We have held that our "inquiry in assessing that interest is fact-specific and practical, not doctrinal ...." In re L.W., 613 A.2d 350, 355 (D.C.1992). "As one court has aptly noted, magic formulas have no place in decisions designed to salvage human values." Bazemore v. Davis, 394 A.2d 1377, 1383 (D.C.1978) (citing Lemay v. Lemay, 109 N.H. 217, 247 A.2d 189, 191 (1968)).
Appellant cites several cases from other jurisdictions that have recognized that the age of a prospective adoptive parent, while not necessarily a bar to the adoption, was an important consideration in denying the adoption petition.[13] We note, as did the trial judge, that A.C.G. was seventy-eight years old at the time he issued his order granting the adoption of six-year old S.A.S. Thus, it would be unlikely that A.C.G. would live to see S.A.S. reach the age of majority.[14] The trial court found that this situation was analogous to a grandmother rearing her granddaughter.[15] Furthermore, the trial court found that A.C.G.'s age should not be a bar to adoption because she has made financial arrangements for S.A.S. and arranged for two backup caretakers, ages sixty-seven and forty-one, who were known to S.A.S. and had agreed to rear her in the event that A.C.G. died or became disabled. See In re Jennifer A., 225 A.D.2d 204, 650 N.Y.S.2d 691, 693 (N.Y.App.Div.1996) (holding that the family court erred in failing to grant adoption petition of a sixty-seven-year old foster parent based on age alone when the foster parent had cared for the child for almost her entire life and had established appropriate backup caretaking arrangements in the event of her inability to care for the approximately five-year old child). We endorse the wisdom of that decision.
The trial court was aware that A.C.G. would most likely not live to see S.A.S. reach the age of majority but that no one could predict with an exact degree of certainty when A.C.G. would be unable to care for S.A.S. Likewise, no one could *444 predict when appellant would achieve the stability and maturity needed so that S.A.S. could return to her care on a permanent basis since the trial judge found that appellant had not complied with social workers' and psychologist's recommendations to insure S.A.S.' safety and well-being after Judge Christian's March 2000 neglect finding. See In re L.L., 653 A.2d 873, 888 (D.C.1995) (concluding that a child should not have to forego "an emotional attachment to a permanent caretaker" in order "to await uncertain parental maturity") (internal citations and quotations omitted). The trial court reasoned that removing S.A.S from A.C.G.'s custody, the only mother the child has ever really known for almost seven years, would likely have a severe impact on her emotional development at her young age. Moreover, the court could properly give weight to A.C.G.'s own judgment, reached after several years of parenting S.A.S., that the child needed the permanency and stability that adoption alone would provide. While S.A.S.' continuity of care by A.C.G. could not be assured, the trial court found that A.C.G. had arranged for two backup caretakers and engaged in financial planning to insure S.A.S.' future stability.
Although the trial judge's findings of facts do not discuss why he did not view granting guardianship to A.C.G. as an option, the issue was raised at trial. A.C.G. testified that she was not seeking custody or guardianship because "guardianship seems to be something that can be renegotiated and renegotiated and renegotiated." After considering this option based on the relationship of all the parties in this case, we conclude that granting guardianship to A.C.G. would only further serve to leave S.A.S. in "legal limbo." Although S.A.S. was never placed in the foster care system, she has lived with her great-aunt under an informal custody arrangement since she was two months old. The law requires that this child have some permanency in her life after nine years. See In re J.G., 831 A.2d 992, 1001 (D.C.2003) (concluding that "indefinitely deferring adoption or termination of parental rights . . . is inappropriate where a birth parent's ability to reunite with the child within a reasonable time is entirely speculative"). Therefore, we conclude that the grounds relied on and articulated by the trial judge are sufficient to disclose an exercise of discretion to reject that alternative and hold that the trial court did not abuse its discretion when it granted A.C.G.'s petition to adopt S.A.S.
Accordingly, the judgment of the trial court is affirmed.
So ordered.
SCHWELB, Associate Judge, dissenting:
In my opinion, the trial judge in this case asked the wrong question, and doing so led him to the wrong answer. If the principal and in my view dispositive issue is framed correctly, then, as I see the case, a decree permitting A.C.G. (the paternal great aunt) to adopt S.A.S. and terminating the parental rights of E.D., the birth mother, is premature and too extreme a remedy. The best interests of the child can be preserved, protected, and even advanced if S.A.S. remains in the custody of the great aunt, but if the birth mother, who obviously cares for S.A.S. and of whom S.A.S. is obviously very fond, is not removed from her daughter's life forever. Moreover, the trial court's judgment also terminates any legal relationship between S.A.S. and her sister, who was sixteen years old at the time of the hearing, who is an honor student, and who has been successfully raised by the mother.
The trial judge treated this case essentially as a contest between the great aunt *445 and the birth mother for custody of S.A.S. The judge wrote, for example, that
[d]uring the formative years of this child's life, petitioner has been the guiding force and has molded her into what she has become today. To separate her from this steady progressive development of her as a person in the home of the petitioner and to return her to her mother at this stage in her life would in this [c]ourt's view likely have traumatic impact on her emotional development as a person. It is this [c]ourt's humble view that she would suffer and regress in her development. This [c]ourt is not prepared to take that risk with this child's promising life in the care of the petitioner in this case.
(Emphasis added.) Obviously, the judge assumed that the only options before him were (1) to return S.A.S. to her birth mother's custody, or (2) to terminate the birth mother's parental rights by waiving the requirement that she consent to her daughter's adoption. In his forty-page order, the judge discussed no other possibility. Further, for the most part, my colleagues in the majority appear to accept uncritically the trial judge's assumption that only two choices were available.[1]
But contrary to the trial judge's apparent perception, a return of S.A.S. to her mother's custody was not the only alternative to the termination of the mother's parental rights. The birth mother argues that, even if custody is not granted to her, then some intermediate arrangement e.g., making the great aunt S.A.S.' legal guardiancould be ordered without severing all of the child's legal ties with her birth mother and sister. This alternative possibility was raised on several occasions during the evidentiary hearing, and the trial judge was plainly apprised of it. In closing argument, the birth mother's counsel stated:
Even if the [c]ourt does not feel it appropriate to move this child at this time, when this child is 15 and the caretaker is 87 years old, leave this option open. Leave the birth parents' rights intact.
There was, and remains, ample reason not to exclude the birth mother and sister from the life of S.A.S. In his brief on appeal, counsel for the birth mother has effectively summarized the relationship between S.A.S. and her mother and sister. So far as I am aware, none of what counsel has written is disputed, and I quote from it at length:
Prior to court intervention, the mother ha[d] weekend visitation with S.A.S. at her home.... During the neglect proceedings, E.D. had weekly supervised visits at Child and Family Services Agency (hereinafter CFSA). These were quality visits that almost always included J., [S.A.S.'] teenage sister. Social worker Thomas Mrosko, who supervised 29 or 30 visits, testified that all visits were a happy time for the child, that the mother was always appropriate, that the child was generally "real happy to see her mom and they play a lot of games throughout the visit. The mother usually comes very prepared for the visit ... and the interaction is a lively good time, it would appear to me." ... Likewise, S.A.S. and her teenage sister J. were always extremely happy to see each other. Dr. Eugene C. Stammeyer, a psychologist called by E.D., clinically observed a visit between E.D. and J. with [S.A.S.]. Initially, he observed the child with A.G. in what he described as *446 her "joyful[] anticipation" of her mother's arrival.... Upon the mother's and J.'s arrival, [S.A.S.] excitedly stated "here they come, here they come!" Dr. Stammeyer described a very pleasant visit and a natural and appropriate relationship between [S.A.S.], her biological sister, and her birth mother.... Even the trial court found that "S.A.S. enjoys the visits with her mother and her sister J.R., and the mother acts appropriately in the visits with S.A.S. and shows her affection and concern." ... The child was not adversely affected by the visits in any manner.
(Citations to record omitted.)
In my view, it is, and should be, highly unusual to terminate a mother's parental rights where the relationship between a child and her mother and sister is as positive and productive as is the one in this case. As this court has recently reiterated, the "termination of parental rights is a `drastic remedy,' and may be ordered only upon a showing of `clear necessity.'" In re J.G., Jr., 831 A.2d 992, 1000 (D.C.2003) (citing In re A.S.C., 671 A.2d 942, 951 n. 14 (D.C.1996)) (emphasis added); see also In re L.L., 653 A.2d 873, 887 (D.C.1995). Indeed, a birth parent has a "`fundamental liberty interest' in the care, custody or control of her child." In re J.G., Jr., 831 A.2d at 1000; accord Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); In re L.W., 613 A.2d 350, 355 (D.C.1992). Although, in the crunch, the birth parent's rights are subordinate to the best interests of the child, In re L.L., 653 A.2d at 880, "clear necessity" must be established. In my opinion, one cannot fairly conclude that the great aunt has sustained this formidable burden.
As we stated in In re L.L., 653 A.2d at 887,
[l]egislatures and courts alike have recognized that, in the words of one commentary, "no child can grow emotionally while in limbo. [S]he cannot invest except in a minimal way ... if tomorrow the relationship may be severed."
(Citations omitted.) Further, "[a]lmost everyone agrees that a child should not be suspended permanently in foster care if any other solution is possible." Id. at 888 (citations and ellipsis omitted). Accordingly, in many or most cases a "wait and see" option must yield to the stability of adoption and a permanent home. I agree with these propositionsindeed, I wrote the court's opinion in In re L.L.but in my opinion, they have little or no applicability here. Indeed, in this case, adoption and termination of the mother's parental rights tends, to some extent, to impair stability, and to interfere with a favorable status quo, by preventing the continuation of regular visitation by the child's mother and sistervisitation which, by all accounts, went very well for all concerned, and especially S.A.S.[2]
It is short-sighted to conclude that this adoption makes the home that the great aunt has provided to S.A.S.by all accounts a warm and loving home"permanent." As this dissenting opinion is being written, the great aunt is eighty years of age, more than seventy-one years older than S.A.S. It is, of course, possible that the great aunt will be able to parent S.A.S. *447 until S.A.S. reaches maturity, but surely that possibility is quite speculative when, by the time S.A.S. reaches the age of twenty-one, the great aunt will be more than ninety years old. It is possible, if not extremely probable, that the present arrangement is temporary, and that the great aunt's advanced age will require a significant change within the foreseeable future in the care of S.A.S. Even when prospective adoptive parents are in their early or middle sixties, "[a]ge is a legitimate factor to be considered in adoptions[,] especially if the petitioner could not be expected to be in good health until the child is emancipated." Sonet v. Unknown Father, 797 S.W.2d 1, 5 (Tenn.Ct.App.1990).[3] Thus, although in In re L.L. and other like cases, adoption would effectively assure stability for the child, this is not at all true in the present case.
The trial judge found that there were two "backup persons" who could, if necessary, take over for the great aunt, namely, a cousin, "who is only 67 years of age,[4] and in good health," and the cousin's daughter, "who at time of the trial was only 41 years of age." The judge concluded, remarkably in my view, that "the availability of these backup resources totally eliminates the issue of petitioner's age from this case as being a bar to the adoption." (Emphasis added.) Neither the great aunt's cousin nor the cousin's daughter has had a parental relationship vis-a-vis S.A.S.,[5] and it is surely premature to state today that if
1. the great aunt should die or become disabled in, say, five years; and
2. the relationship between S.A.S. and her birth mother and sister, including regular visitation, has continued successfully during the five-year period,
the great aunt's relatives would then be more appropriate custodians for S.A.S. than the mother would. Without a crystal ball, we simply cannot tell what the situation will be a few years from now. People change, and so do circumstances. The judge's decision to sever all legal ties between S.A.S. and her birth mother and sister, without knowing what the future would bring, would not only unnecessarily limit future options, but would also bring to an end relationships with her mother and sister which have brought S.A.S. much love and happiness. The trial judge's decision was not, in my opinion, in the best interest of S.A.S.
I recognize that S.A.S. was evidently sexually abused while in the birth mother's custody and that two trial judges have found one of the birth mother's sons to be responsible for the abuse. In the neglect case that preceded the adoption matter, this court stated that "[a]lthough the District's case against the mother ... is less than overwhelming, we think it is sufficient, although perhaps barely so, to pass muster." In re S.S., 821 A.2d 353, 359 (D.C.2003). In the present case, the trial judge, having heard additional evidence, expressed great certainty about what occurred, and I cannot say that his findings regarding the abuse and the mother's unsatisfactory reaction to it were clearly erroneous. In my view, however, this is *448 essentially irrelevant to the critical issue before us. I do not contemplate an immediate return of S.A.S. to the mother's custody, and continued visitation, successful to date, would not create a danger of future sexual abuse.
It is sadterribly, overwhelmingly sadand it fills all reasonable persons with unremitting horror that this child, or any child, should have to suffer what young S.A.S. has already been compelled to endure. To the extent that the birth mother was complicit in this tragedy by her inaction and her refusal to believe or deal with what apparently happened,[6] it must surely be upon her conscience until the day she dies. Nevertheless, the mother has visited S.A.S. regularly (usually in the company of the child's older sister), and she has built up a positive relationship with her daughter. S.A.S. should not be deprived of that relationship with her mother and her sister in order to punish the mother for her unfortunate acts and omissions. Accordingly, I would reverse the judgment and remand the case with directions that the trial court deny the petition for adoption. I would leave intact the trial court's ruling that the birth mother is not presently entitled to custody of S.A.S., and I believe that the trial court should consider guardianship or some similar arrangement to enhance the great aunt's position. The birth mother should also be required to pay reasonable child support.
For the foregoing reasons, I respectfully dissent.
NOTES
[1] The child's father, S.S., was incarcerated at the time of the adoption trial. Prior to the trial, he spent several years in jail on felony drug charges and probation violations.
[2] We upheld Judge Christian's order in In re S.S., 821 A.2d 353, 359 (D.C.2003) (Schwelb, J.) with respect to her determination of neglect by appellant despite the fact that we found the sufficiency of the evidence to be "less than overwhelming." We did, however, find that there was insufficient evidence to show that, as a non-custodial parent, appellant had failed to provide proper parental care and control. Id. at 360 n. 14.
[3] Ms. Smith was also present on the February day when E.D. evicted S.A.S. and her father from the apartment where they had been living. Ms. Smith had driven S.A.S. and her father to the doctor's appointment where S.A.S. had received physical therapy.
[4] It was not totally clear from E.D.'s testimony that Ke.D. was evaluated and received therapy for acts associated with sexual abuse. It would appear from the record that he saw a therapist for problems associated with Attention Deficit Hyperactivity Disorder.
[5] Dr. Stammeyer testified that his opinions were based on accepting E.D.'s versions of events that occurred in her life as being truthful. His testimony revealed that E.D. told him that S.A.S.' father took her from their jointly shared apartment to live with A.C.G. E.D. did not mention that she evicted the father and infant child from the apartment.
[6] When A.C.G. became aware that S.A.S. was acting inappropriately, she attempted to bring the matter to E.D.'s attention. A.C.G. testified that E.D. "seemed very annoyed." It was A.C.G. who took action to insure the child received medical treatment, not E.D.
[7] E.D., at the time of the trial, was trying to "work on [getting back together]" with her husband, twelve years her junior, whom she married in February 1999. The couple separated in 2000. Shortly after their marriage, her husband filed papers with the INS that permitted him to be a legal resident of the United States. E.D. denied that this was a marriage of convenience or that the man paid her for filing the immigration papers.
[8] Conversely, although the court noted that A.C.G.'s elderly brother had a long history of mental illness and resided in her home with S.A.S., this relative was found to be of no danger to the child or others because he had been receiving constant treatment and was compliant with his medications.
[9] Thomas Mrosko, the social worker assigned in April 2002 after the trial court found that S.A.S. was neglected, supervised these visitation sessions and testified that these were happy times for all of the participants and that E.D. interacted appropriately with S.A.S. Likewise, Dr. Eugene Stammeyer, E.D.'s expert witness, who also observed one of these visitation sessions, testified that he believed the child "joyfully anticipat[ed]" her mother's arrival.
[10] Ms. Smith also described certain incidents of rude behavior exhibited by E.D. and her teenage daughter towards her during the supervised visitation sessions when she was out of sight of the social workers.
[11] This behavior is further demonstrated by E.D.'s actions in February 1997. After S.A.S' father returned from taking the child to a doctor's appointment, E.D., according to her own testimony, placed the child on the sidewalk in inclement weather because "he [S.A.S.' father] has to take her because I was going to apply for this apartment." (Emphasis added.)
[12] E.D. testified that although she knew S.A.S. was living at her great-aunt's house, she had not paid any child support because she did not want to give S.A.S.' father any money because he used drugs and alcohol. However, she could have chosen to pay the child support to the great-aunt but did not do so.
[13] See, e.g., Frantum v. Dep't of Pub. Welfare, 214 Md. 100, 133 A.2d 408, 410, 412 (1957) (concluding that adoption by a younger couple would be better for the child since the prospective adoptive parents were fifty-four and forty-eight); In re Adoption of Kelley, 23 Or.App. 301, 541 P.2d 1304, 1305-06 (1975) (affirming the trial court's judgment to permit the adoption of a child by his maternal grandparents instead of his fifty-six-year old great-aunt based on her age as well as other factors including the natural father's consent to the adoption by his parents, who the court found were financially more stable, and the child's ability to live in a two-parent household with his other half-siblings); Sonet v. Unknown Father of Joseph Daniel Hasty, 797 S.W.2d 1, 5 (Tenn.Ct.App.1990) (finding that age was a factor to be considered in denying a seventy-year old woman's adoption petition but that petitioner also did not possess appropriate parenting skills); In re Adoption of Shields, 4 Wis.2d 219, 89 N.W.2d 827, 832 (1958) (denying petition of adoptive parents aged fifty-one and forty-four in favor of a younger couple because they were forty years older than the child and they were known to the natural parents).
[14] A.C.G. testified at the adoption trial that she had a mastectomy in 1990 due to cancer. The cancer had not reoccurred and she was otherwise in good health. She stated that she has started wearing hearing aids to compensate for a slight hearing loss.
[15] This type of caretaking relationship is not unusual in the District of Columbia. See Grandparents Raising Children Can Get Aid, WASH. POST, Jan. 11, 2006, at B3 (stating that "More than 16,000 children live in homes in which a grandparent is the head of the household. More than 8,000 grandparents report they're raising their grandchildren.").
[1] See, e.g., maj. op., ante p. 441 ("The court found that ... a return to [the birth mother's] custody would cause regression in the emotional development of this seven-year old child.") (Emphasis added.)
[2] According to the majority "granting guardianship to [the great aunt] would only further serve to leave S.A.S. in `legal limbo.'" Maj. op., ante p. 444 (emphasis added). I do not agree with this characterization. First, S.A.S.' status will realistically be in limbo even if adoption is granted, for the great aunt's advanced age makes the future uncertain. Moreover, in my opinion, the word "only" is unwarrantedadoption will also end S.A.S.' opportunity to continue a very favorable relationship with her birth mother and her sister.
[3] The prospective adoptive mother in Sonet was sixty-five years of age. The prospective adoptive father, who later dropped out of the case, was sixty-two. The court affirmed the denial of the petition for adoption, in part, because of the prospective adoptive mother's age. The great aunt in this case, of course, is far older than her counterpart in Sonet.
[4] In my opinion, the judge's use of the word "only" in this context is somewhat remarkable. When S.A.S. is seventeen the cousin will be seventy-seven!
[5] As my colleagues point out, however, one of the "backup[s]" has had significant contacts with S.A.S.
[6] Although the evidence supports the finding that the birth mother's actions in response to the allegation that her son had abused S.A.S. were unsatisfactory, it is surely understandable that, as a mother, she would at least initially be reluctant to believe that her own son had engaged in such unspeakable conduct.