IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 13, 2014

IN RE MICHAEL A. C., JR.[1]

**Appeal from the Juvenile Court for Cumberland County**
**No. 2013-JV-3765      Larry Michael Warner, Judge**

_____

**No. E2014-01268-COA-R3-PT-FILED-NOVEMBER 17, 2014**

_____

This is a parental rights termination appeal brought by the incarcerated biological father. The trial court found clear and convincing evidence to support the ground for termination and clear and convincing evidence that termination was in the child's best interest. The father appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and THOMAS R. FRIERSON, II, J., joined.

Jeffrey A. Vires, Crossville, Tennessee, for the appellant, Michael A. C., Sr.

Robert E. Cooper, Jr., Attorney General and Reporter, and Jason I. Coleman, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Olana Burgess, Crossville, Tennessee, Guardian ad Litem.

**OPINION**

**I. BACKGROUND**

This is an appeal of the termination of the parental rights of Michael A. C., Sr.,

_____

[1]To protect the identity of children in parental rights termination cases, initials are used instead of last names.

("Father") to Michael A. C., Jr., ("the Child") (d.o.b. 9/3/1999).  Father is currently serving an eight-year sentence for felony robbery -- his third conviction for robbery.

Following the death of his mother in 2008, the Child first lived with his grandmother until she passed away.  He then lived with a maternal aunt who used drugs.  In 2011, the Child was found to be dependent and neglected, at which time an aunt and uncle, Melissa and Jesse B., took custody of him. However, in May 2012, the uncle brought the Child to a DCS office and stated he could no longer care for him.  DCS filed a petition to declare the Child dependent and neglected and for emergency temporary legal custody.

Father has not seen the Child since October or November of 2011.  In 2007, Father had been ordered to make monthly child support payments in the amount of $271.  The record reveals, however, that he only made one payment, despite being employed after he was released from prison in 2011. Father has numerous job skills, including concrete finishing, "any kind of flooring," operating heavy equipment, and "just about anything," and has acknowledged that he "can pick up construction work pretty much whenever" he needs to. He worked for Ken Berry Construction during most of 2012, an employer for whom he has worked off and on for 10 years, making $10 per hour.  He also worked for two other companies in 2012.

Amy O'Neill, a DCS team leader, stated that she and Brandie Storm, the DCS case worker assigned to the Child's case, diligently attempted to locate Father when the Child came into custody.  DCS finally found Father and called him on October 25, 2012, at which time Father was a fugitive of the law and refused to provide an address for correspondence.  On November 6, 2013, Ms. Storm met with Father at Turney Center Prison, at which time she reviewed with Father the permanency plan, the surrender process, and the Criteria and Procedures for Termination of Parental Rights.  Eight days later, DCS petitioned to terminate the parental rights of Father to the Child.

The following January, after Father had been relocated, Ms. O'Neill determined his new residence and mailed him a letter, requesting a guide of services available to him as well as contact information for his counselor in order to set up a conference call. She also encouraged Father to write letters and send pictures to the Child.  Thereafter, Patsy Croinex, a DCS case manager[2] assigned to the Child's case, left messages with the warden of the correctional facility where Father was housed.  In early March, she sent a letter to Father with her contact information, asking that he contact her as soon as possible.  In mid-March, Ms. Croinex met face-to-face with Father. On five occasions between March 27 and April 10,

_____

[2]Ms. Croinex works for Foothills, an organization that has a contract with DCS to provide case management.

Ms. Croinex called Father's social worker to ask for information about Father's prison programs, drug screens, and regarding a phone call with Father. She also called the Unit Manager on April 11. On six occasions between April 21 and the end of May, Ms. Croinex called the facility to speak to Father but could only leave messages with the social worker. She also sent Father a copy of the updated permanency plan and a book of stamps for him to use to write letters to the Child. Ms. Croinex was finally able to speak to Father on June 3. Upon requesting weekly phone calls with Father, the warden denied the request, stating that Father would have to use the money he earned in prison to call her.

Trial on the termination of parental rights took place on June 30, 2014. Ms. O'Neill opined that the Child has a strong bond with the pre-adoptive foster parents. The Child is involved with the Boy Scouts through his foster father and wants to become an Eagle Scout. The foster parents have encouraged him to participate in sports, with a successful outcome.[3] Ms. O'Neill related that the Child has "adamantly refused to go and visit" Father, and he refuses to read the letters Father sends him. In fact, the Child has instructed Ms. Croinex, to "[t]ake them and burn them. I don't want to see them." She testified that DCS does not force a teenager to have contact with a parent at a prison if the child is adamant about not wanting contact.

Ms. Croinex related to the court the difficulty she had in getting in contact with Father while he has been incarcerated. She testified that Father has yet to use the money he earns to make phone contact with her, as required by the warden.

Father testified that he had recently been granted parole and, upon his release in March-June 2015, will reside in a halfway house for at least six months. He stated that in spite of his tenth grade education, he has "numerous job skills." According to Father, he is a concrete finisher, "can do any kind of flooring[,]" can "[o]perate heavy equipment[,]" and "[d]rive anything that has got wheels on it." As to visitation and support of the Child, Father related the following at trial:

Q      So you were given supervised visitation?

A      Yes, sir.

Q      Did you take advantage of that?

A      Yes, sir. I walked twenty miles from where I was living at. I had to go

---

[3]The record contains a note indicating that "therapy has just been reduced because the child is doing so well."

by what [the uncle] said. And he wanted me to come to church every other Sunday for two hours. . . . And [the uncle] stated that he went to church in Knoxville off of Central Avenue. So that was about twenty miles from where I was staying. So I would get up on Sunday morning and I would walk all the way to church so I could see [the Child] for two hours . . . . After service one time he took us to the park and let me throw the football with [the Child] for about thirty minutes . . . .

\* \* \*

A        After I had been seeing them[4] for about three months, it started getting October or November, and it was starting to get cold outside. And [the uncle] asked me would I get [the Child and his sister] a coat, that they had a jacket but they needed a coat. . . . And I told him, yeah, but I would have to buy one one week, and then the next week I would buy the other one. And that wasn't good enough for him. He went through the roof and told me not to never call them back. That's when I stopped actually being able to see [the Child] -- October or November, something like that.

Father noted that he has been unable to contact the Child because he does not have an address or telephone number for his son.

On July 1, 2014, the trial court entered a Final Decree of Guardianship. The court found "clear and convincing evidence" that grounds existed to terminate Father's parental rights to the Child on the grounds of abandonment by an incarcerated parent by willfully failing to visit, willfully failing to support, and conduct exhibiting wanton disregard for the Child's welfare. Furthermore, the court concluded that terminating Father's parental rights was in the best interest of the Child. *Inter alia*, the following findings were made by the trial court:

[The Child] was placed in the custody of [DCS] due to dependency and neglect on May 7, 2012.

[The Child] has remained continuously in foster care since 5-7-12.

The Respondent, [Father] has been incarcerated during the four consecutive

_____

[4]The uncle who relinquished control of the Child to DCS retained custody of the Child's sister, the biological daughter of Father.

-4-

months prior to the filing of this petition. [Father] has been incarcerated from 12-31-12 to present. [Father] was not incarcerated from 5-7-12 until 12-31-12.

[Father] willfully failed to support said [C]hild for four (4) months immediately preceding his incarceration. [Father] has not contributed to the support of the [C]hild since at least 5-7-12. [Father] was able-bodied and capable of working and supporting the [C]hild prior to his incarceration. [Father] was aware of his duty to support the [C]hild. [Father] made no attempt to support the [C]hild. [Father] reports a work history in construction. He reported working . . . from January to October 2012. . . .

[Father] willfully failed to visit said [C]hild for four (4) months immediately preceding his incarceration. [Father] has not visited the [C]hild since at least 5-7-12. [Father] was aware of his duty to visit the [C]hild prior to his incarceration. . . .

* * *

The Respondent, [Father] engaged in such conduct prior to incarceration as to exhibit a wanton disregard for the welfare of the [C]hild. The Respondent's conduct in wanton disregard for the welfare of the [C]hild was to have abused drugs and have repeated incarcerations through much of the [C]hild's life. His convictions include, but are not limited to: Evading Arrest, Knox County Criminal Court 3-1-05; Reckless Driving, a lesser included offense, Knox County Criminal Court 3-1-05; two separate convictions for Robbery, a lesser included offense, with the offenses occurring on different dates, Knox County Criminal Court 8-17-07; Robbery, Knox County Criminal Court 3-27-13; Revocation of Unsupervised Probation, Knox County Criminal Court 6-27-06; and Revocation of Probation, Knox County Criminal Court 8-17-07. He has told the DCS case manager that he has a history of abusing drugs and stealing. He received an eight year sentence on the most recent charge. He has had little to no contact with the [C]hild for more than half of the [C]hild's life. He did not step forward after the [C]hild's mother died to take care of the [C]hild or to provide a safe and stable home for the [C]hild.

Pursuant to the best interest of the child considerations, the court made the following determinations:

[Father] has not made an adjustment of circumstances, conduct or conditions as to make it safe and in the [C]hild's best interest to be in the home of the

parent. . . .

[Father] has not maintained regular visitation or other contact with the [C]hild. . . .

A meaningful relations has not otherwise been established between the [C]hild and [Father]. . . .

There was criminal activity in [Father]'s home prior to his incarceration. . . .

[Father]'s use of alcohol or controlled substances prior to his incarceration rendered him consistently unable to care for the [C]hild in a safe and stable manner. . . .

[Father]'s emotional status would be detrimental to the [C]hild and/or prevent him from effectively providing safe and stable care and supervision for the [C]hild. . . . For whatever reason, he has not been able to reach the emotional maturity to refrain from breaking the law and living a stable and productive life. . . .

[Father] has not paid child support consistently within the child support guidelines promulgated by [DCS] . . . .

[Father] has not paid a reasonable portion of the [C]hild's substitute physical care and maintenance when financially able to do so. Prior to his incarceration he did not provide food, clothing, toiletries, books, school supplies or any o[f] the other items the [C]hild needed on a daily basis.

[Father] has shown little or no genuine interest in the welfare of the [C]hild.

[Father] continued to make lifestyle choices prior to his incarceration that prevent him from being able to parent the [C]hild or to provide a home for the [C]hild.

The [C]hild has expressed a desire to have parental rights terminated. The [C]hild has a negative bond with his father. He wants nothing to do with his father.

The [C]hild and foster parents have a strong bond.

The [C]hild needs to be released from the stigma of being a foster child.

(Numbering in original omitted.).  Father timely filed a notice of appeal.

## II.  ISSUES

A.      Whether the trial court properly determined that Father abandoned the Child by willfully failing to visit him, willfully failing to support him, and engaging in conduct exhibiting a wanton disregard for his welfare.

B.      Whether the trial court properly determined that the termination of Father's parental rights was in the Child's best interest.

## III.  STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed.2d 551 (1972); *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652–53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36–1–113(I)(1)). " '[F]ew consequences of judicial action are so grave as the severance of natural family ties." ' *M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 136 L. Ed.2d 473 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787, 102 S. Ct. 1388, 71 L. Ed.2d 599 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002).  Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship.  *In re Drinnon*, 776 S.W.2d at 97.  "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights.  *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), abrogated on other grounds by *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental rights termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002–02603–COA–R3–JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug.13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

The Tennessee Supreme Court has provided guidance in reviewing cases involving the termination of parental rights:

> A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn. 2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36–1–113, *the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim.* *State Dep't of Children's Servs. v. Mims*, 285 S.W.3d [435,] 447–48 [(Tenn. Ct. App. 2008)]; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004). Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010) ]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596–97 (Tenn. 2010) (emphasis added).

On appeal, the trial court's specific findings of fact are reviewed de novo upon the record with a presumption of correctness, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). Because of the heightened burden of proof required in termination cases, *see* Tenn. Code Ann. § 36-1-113(c)(l), the appellate court also "must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to

terminate a biological parent's parental rights." *In re M.J.B.,* 140 S.W.3d at 654 (citing, *inter alia, Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002)). Regarding the credibility of trial witnesses, the reviewing court should give considerable deference to the trial court's findings. *McCaleb v. Saturn,* 910 S.W.2d 412, 415 (Tenn. 1995); *see Sonet v. Unknown Father of J.D.H.,* 797 S.W.2d 1, 5 (Tenn. Ct. App. 1990) (stating that "the findings of the trial court as to the credibility of the witnesses are entitled to great weight").

## IV. DISCUSSION

### A.

Tennessee Code Annotated section 36-1-113 provides the grounds for termination of parental rights. The applicable provisions read as follows:

> **36-1-113. Termination of parental rights.** – (a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child . . . by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.
>
> * * *
>
> (c) Termination of parental or guardianship rights must be based upon:
>
> > (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> >
> > (2) That termination of the parent's or guardian's rights is in the best interests of the child.
>
> * * *
>
> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). . . :
>
> > (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred . . . .

Tenn. Code Ann. §§ 36-1-113(a)-(g)(1).  Relevant to the facts of this case, Tennessee Code Annotated section 36-1-102(1)(A)(iv) provides that abandonment means that

> the parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-l-102(1)(A)(iv).  Most recently, Father has been incarcerated since December 31, 2012. Thus, the appropriate four-month window for his failure to visit and support is August 30, 2012, through December 30, 2012. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv).   We have explained that "willfulness"

> does not require the same standard of culpability required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

*In re Audrey S.*, 182 S.W.3d 838, 863-64 (Tenn. Ct. App. 2005) (citations omitted).  The party seeking termination carries the burden of proof.  *In re M.J.B.*, 140 S.W.3d at 653.


## FAILURE TO SUPPORT


"A parent's obligation to support his or her child exists regardless of a court order requiring the parent to pay support." *In re Jacob M.J.*, 434 S.W.3d 565, 572 (Tenn. Ct. App. 2013) (quoting Tenn. Code Ann. § 36-1-102(1)(H)).   Furthermore, "[e]very parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children." *Id.*  Father has only made a one-time payment of $271 in support.  His failure to support the Child was willful, as he has a variety of job skills, and held several jobs during 2012. In fact, Father admitted that he "can pick up construction work pretty much whenever" he needs to do so.  Accordingly, we conclude that there was clear and convincing evidence to establish that Father abandoned the Child by

willfully failing to remit child support during the relevant time period and that a statutory ground therefore existed for termination of Father's parental rights.

## FAILURE TO VISIT

Father asserts that any efforts he made to see the Child failed because of transportation issues and "the ill-will of his deceased wife's family members who were caring for" the Child. He asserts that his failure to visit was not willful. The record reveals, however, that Father could have avoided any familial interference when the Child came into DCS's custody in May 2012, prior to the four-month window. Further, Father became aware in October 2012, that DCS had custody of the Child, but he refused to cooperate with DCS because he had become a fugitive by that time. He has not seen the Child since October or November 2011. We therefore conclude that clear and convincing evidence exists to establish that Father willfully failed to visit the Child during the relevant time period. Thus, a second statutory ground existed for the termination of Father's parental rights.

## WANTON DISREGARD

A "parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." *In re Audrey S.*, 182 S.W.3d at 866. It is well established "that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id.* at 867-68 (citations omitted). Father's pattern of conduct clearly demonstrates wanton disregard for the welfare of the Child. He has exhibited a substantial amount of criminal behavior, having been "in and out of jail" most of his life. The evidence does not preponderate against the trial court's findings that clear and convincing evidence existed to establish the termination ground alleged.

## B. BEST INTEREST

Having concluded that there was clear and convincing evidence supporting a statutory ground to terminate Father's parental rights, we must consider whether termination of Father's parental rights was in the best interest of the Child. In making this determination, we are guided by the non-exhaustive list of factors provided in Tennessee Code Annotated section 36–1–113:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36–5–101.

Tenn. Code Ann. § 36–1–113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[ ] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36–1–101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

The proof clearly reveals that termination of Father's parental rights was in the Child's best interest. Father has not made an adjustment of circumstances, conduct, or conditions to make it safe for the Child to return to him. Tenn. Code Ann. § 36-1-113(i)(l). He is currently in prison and has a history of drug abuse. He has not paid child support. Tenn. Code Ann. § 36-1-113(i)(9). Father, who has not spoken to the Child since 2011, has not maintained regular visitation or contact with the Child. Tenn. Code Ann. § 36-1-113(i)(3). No meaningful relationship has been formed and changing the Child's caretakers would have a very detrimental effect on him. Tenn. Code Ann. § 36-1-113(i)(4)-(5). The Child has "adamantly refused to go and visit" Father. He refuses to read letters Father sends him and told the case manager to "[t]ake them and burn them. I don't want to see them." The Child has established a positive bond with his pre-adoptive foster parents. In consideration of the foregoing factors, we find that the trial court correctly concluded that termination of Father's parental rights was in the Child's best interest.

## V. CONCLUSION

The judgment of the trial court is affirmed, and this case is remanded for such further proceedings as may be necessary. Costs of the appeal are assessed to the appellant, Michael A.C., Sr.

_____
JOHN W. McCLARTY, JUDGE